LOVE v. JUDGE OF RECORDER'S COURT OF DETROIT.

1. MUNICIPAL CORPORATIONS—USE OF PUBLIC PLACES—REGULATION—FREEDOM OF SPEECH—PUBLIC ADDRESSES.

The power conferred on the common council of Detroit by the charter, to control and regulate the manner in which the streets, alleys, and public grounds and spaces within the city shall be used and enjoyed, includes the power to regulate the use of such places for the making of public addresses.

2. SAME—ORDINANCES—REASONABLENESS.

An ordinance forbidding the making of any public address in any public place within a half-mile circle of the city hall, without first obtaining a permit from the mayor, is a valid exercise of such power.

| 128 | 545 |
| s87NW | 785 |
| 129 | ²636 |
| 128 | 545 |
| s87NW | 785 |
| 194US | ¹370 |
| 128 | 545 |
| 153 | 95 |

*Mandamus* by Charles E. Love, assistant corporation counsel of the city of Detroit, to compel James Phelan, judge of the recorder's court of said city, to entertain a complaint for the violation of a city ordinance. Submitted October 8, 1901. Writ granted November 4, 1901.

*Timothy E. Tarsney* and *Charles E. Love*, for relator.

*James H. Pound*, for respondent.

MOORE, J. This is a proceeding to compel the respondent to entertain a prosecution against one William Allen.

There is an ordinance in the city of Detroit the material portions of which read as follows:

"An ordinance to regulate the use of public streets, avenues, parks, grounds, and other public places in the city of Detroit.

"*It is hereby Ordained by the People of the City of Detroit:*

"SECTION 1. No person shall, in or upon any of the public streets, avenues, parks, grounds, or other public places within the one-half mile circle from the city hall,

128 MICH.—35.

make any public address, beat drums, blow horns, or expose for sale any goods, wares, or merchandise, erect or maintain any booth, stand, tent, or apparatus, except in accordance with a permit from the mayor, such permit to designate the time and place when said person or persons may avail themselves of the privileges herein granted. And no permit shall be granted to any person or persons for more than one night in each week."

After this ordinance was passed, a complaint was made, the essential part of which is as follows:

"William Rutledge, being first duly sworn, makes complaint and says that at the city of Detroit aforesaid, on the 13th day of August, A. D. 1901, within the corporate limits of the city, in a public place known as the 'Campus Martius,' being within the one-half mile circle from the city hall, one William Allen did then and there unlawfully and willfully make a public address in the aforementioned public place without first having obtained a permit therefor from the mayor of the city of Detroit, and did, by reason of making such address, gather or cause to gather a large crowd of people, to wit, one hundred people or thereabouts, to the evil example of all others in the like cause offending, and contrary to the ordinances of said city in such case made and provided."

This complaint was presented to the recorder, and, when Mr. Allen was arraigned, the recorder, deeming the ordinance to be invalid, declined to allow the case to proceed, and discharged the accused.

Two questions call for discussion: *First.* Does the charter confer upon the common council power to pass the ordinance? *Second.* Is the ordinance a reasonable and valid exercise of such power?

Section 34, chap. 7, Charter 1893, reads in part as follows:

"Said council shall have power to provide for cleaning the highways, streets, avenues, lanes, alleys, public grounds and squares, crosswalks, and sidewalks in said city, of dirt. * * * It shall further have power to prohibit and prevent incumbering or obstructing streets, lanes, alleys, crosswalks, sidewalks, and all public grounds and spaces with vehicles, animals, boxes, signs, barrels,

posts, buildings, dirt, stones, brick, and all other materials or things whatsoever, of every kind and nature, and to remove the same therefrom; * * * also to control, prescribe, and regulate the manner in which the highways, streets, avenues, lanes, alleys, and public grounds and spaces within said city shall be used and enjoyed."

Section 35 of the same chapter provides that:

"The council may regulate the ringing of bells and the blowing of steam whistles, and may provide for the prohibition and prevention of any riot, rout, disorderly noise, disturbance, or assemblage, or the crying of any goods in the streets or elsewhere in said city."

It is conceded that the Campus Martius is an open paved space nearly front of the city hall, where many of the principal streets of the city join each other. A portion of it is occupied by the soldiers' monument, and nearly all of the street-car lines in the city pass upon one or the other of its borders. Ever since the city has existed it has been a public space within the city. It is difficult to see how power over this space could be more explicitly conferred upon the council than by the language used in the charter giving to it the power "to control, prescribe, and regulate the manner in which the highways, streets, avenues, lanes, alleys, and public grounds and spaces within said city shall be used and enjoyed."

We then come to the second question, Is the ordinance a reasonable and valid exercise of the power conferred? No question is raised as to the manner of the passage of the ordinance, but its reasonableness is questioned. It is insisted by counsel that this phase of the controversy is controlled by what is known as the "*Frazee Case*" (*In re Frazee*, 63 Mich. 396 [30 N. W. 72, 6 Am. St. Rep. 310]). We quote from the brief of counsel:

"I submit that no good reason can be shown why this court should overrule the *Frazee Case*, nor the declarations therein contained for personal liberty. Nearly a generation has passed since this court made the widespread promulgation for personal liberty embodied in the unanimous opinion of this court in the *Frazee Case*. It has

become a landmark among the opinions of this court, and has been more frequently followed and quoted with approbation than any decision in favor of personal liberty it ever rendered. This is my judgment. It has in great measure been the basic stone upon which the Wisconsin case, the Illinois, Kansas, North Carolina, Maryland, and New York cases, rest. While not so famous as the *Sommersett Case*, 20 How. St. Tr. 1, of Lord Mansfield, who declared no man could breathe the air of Great Britain but his shackles fell from him instantaneously; that he was no longer bond, but free; that famous decision which will live, and justly so, as long as history does, as the particular glory of Lord Mansfield's judicial diadem,—the *Frazee Case* is along the same lines. Courts are not organized to aid in repressing innocent liberty, but to give liberty. It is their blessed privilege to make men more free as they become able to enjoy their freedom. Let it not be said that in Detroit a citizen has not the liberty to preach the gospel if he does so to the inconvenience of no public travel."

We think, in his application of the *Frazee Case* to the case at bar, counsel has misunderstood the former case. The question in that case was, Who may travel in the highways? The question in this case is, Who may occupy the public spaces in the city,—some individual who happens to get there first, or shall all the citizens of Detroit have equal rights there? and what shall be the manner of the occupancy? It is evident that no considerable portion of the citizens of a great city like Detroit could occupy this limited space at one time; nor could all of the preachers, teachers, and public speakers in that city who might think they had a message to deliver to the people, with the audiences they would naturally draw, find room at one time in this public space, without rendering it useless as a place across which the public might travel. Under such circumstances, what can be more reasonable than to lodge the power of deciding when and where one may occupy this public space in one having sufficient intelligence and so possessing the confidence of his fellow citizens that they have placed him at the head of the municipal government? The court in the *Frazee Case* had

no trouble in seeing the difference between the use of a street by a moving procession and a stationary assemblage of people, as is shown by the following language used by the court:

"It is not unusual to confine noisy doings to such hours of the day and night as will not grossly disturb the quiet rest of sleep. It has been held, with reason, that a moving crowd may be less obnoxious than a stationary one; and this was said, in substance, when a defendant, who drew crowds to his windows by libelous pictures, and thereby blocked up a highway, undertook to justify himself by the processions of the judges and lord mayor. The remarks of Mr. Justice Park on the subject of crowds which may or may not be nuisances, in *Rex* v. *Carlile*, 6 Car. & P. 636, are quite instructive on this head."

In the case of *Rex* v. *Carlile*, cited by the court, it was held that if a party having a house facing a street exhibit effigies in his window, attracting a crowd, which causes the walks to be so obstructed that the public cannot pass as they ought, this would be an indictable nuisance, even though the effigies were not libelous, nor the crowd made up of idle or dissolute persons.

It is said the ordinance is directed against freedom of speech; but this is a mistake. It is simply directed to the method of using a public space, and is no more a curtailment of the right of free speech than would be an ordinance that prohibited the making of public addresses in the corridors of the city hall. Perhaps no city in the world has been more jealous of the right of free speech than has the city of Boston. But in the growth of that city it was confronted with a like question to the one involved here; that is, How should the use of Boston Common, a public space or park near the center of the city, be regulated and controlled? To meet this condition, the common council passed an ordinance similar to the one in Detroit. The validity of this ordinance was sustained in *Com.* v. *Davis*, 140 Mass. 485 (4 N. E. 577). In 1892 an ordinance was passed reading substantially the same as the Detroit ordinance. Its validity was challenged for

the reasons presented here. The ordinance was sustained in *Com.* v. *Davis*, 162 Mass. 510 (39 N. E. 113, 26 L. R. A. 712, 44 Am. St. Rep. 389). The case was then removed to the Supreme Court of the United States. In the opinion the following language is used:

"It is argued that 'Boston Common is the property of the inhabitants of the city of Boston, and dedicated to the use of the people of that city and the public in many ways, and the preaching of the gospel there has been, from time immemorial to a recent period, one of these ways. For the making of this ordinance in 1862, and its enforcement against preaching since 1885, no reason whatever has been or can be shown.' The record, however, contains no evidence showing the manner in which the ordinance in question had been previously enforced, nor does it include any proof whatever as to the nature of the ownership in the common from which it can be deduced that the plaintiff in error had any particular right to use the common apart from the general enjoyment which he was entitled, as a citizen, to avail of along with others, and to the extent only which the law permitted. On the contrary, the legislative act, and the ordinance passed in pursuance thereof, previously set out in the statement of facts, show an assumption by the State of control over the common in question. Indeed, the supreme judicial court, in affirming the conviction, placed its conclusion upon the express ground that the common was absolutely under the control of the legislature, which, in the exercise of its discretion, could limit the use to the extent deemed by it advisable, and could and did delegate to the municipality the power to assert such authority. The court said:

"'There is no evidence before us to show that the power of the legislature over the common is less than its power over any other park dedicated to the use of the public, or over public streets, the legal title to which is in a city or town. *Lincoln* v. *City of Boston*, 148 Mass. 578, 580 (20 N. E. 329, 3 L. R. A. 257, 12 Am. St. Rep. 601). As representative of the public, it may and does exercise control over the use which the public may make of such places, and it may and does delegate more or less of such control to the city or town immediately concerned. For the legislature absolutely or conditionally to forbid public speaking in a highway or public park is no more an infringement of the rights of a member of the public than for the owner of a private house to forbid it in his house. When

no proprietary right interferes, the legislature may end the right of the public to enter upon the public place by putting an end to the dedication to public uses. So it may take the lesser step of limiting the public use to certain purposes. See Dill. Mun. Corp. §§ 393, 407, 651, 656, 666; *Brooklyn Park Com'rs* v. *Armstrong,* 45 N. Y. 234, 243, 244 (6 Am. Rep. 70). If the legislature had power, under the constitution, to pass a law in the form of the present ordinance, there is no doubt that it could authorize the city of Boston to pass the ordinance, and it is settled by the former decision (*Com.* v. *Davis,* 140 Mass. 485 [4 N. E. 577]) that it has done so.'

"It is therefore conclusively determined there was no right in the plaintiff in error to use the common except in such mode and subject to such regulations as the legislature in its wisdom may have deemed proper to prescribe. The fourteenth amendment to the Constitution of the United States does not destroy the power of the States to enact police regulations as to the subjects within their control (*Barbier* v. *Connolly,* 113 U. S. 27, 31 [5 Sup. Ct. 357]; *Minneapolis, etc., R. Co.* v. *Beckwith,* 129 U. S. 26, 29 [9 Sup. Ct. 207]; *Giozza* v. *Tiernan,* 148 U. S. 657 [13 Sup. Ct. 721]; *Jones* v. *Brim,* 165 U. S. 180, 182 [17 Sup. Ct. 282] ), and does not have the effect of creating a particular and personal right in the citizen to use public property in defiance of the constitution and laws of the State.

"The assertion that, although it be conceded that the power existed in the State or municipality to absolutely control the use of the common, the particular ordinance in question is nevertheless void, because arbitrary and unreasonable, in that it vests in the mayor the power to determine when he will grant a permit, in truth, whilst admitting on the one hand the power to control, on the other denies its existence. The right to absolutely exclude all right to use necessarily includes the authority to determine under what circumstances such use may be availed of, as the greater power contains the lesser. The finding of the court of last resort of the State of Massachusetts, being that no particular right was possessed by the plaintiff in error to the use of the common, is in reason, therefore, conclusive of the controversy which the record presents, entirely aside from the fact that the power conferred upon the chief executive officer of the city of Boston by the ordinance in question may be fairly claimed to be a mere administrative function, vested in the mayor in order to effectuate the purpose for which the common was

maintained and by which its use was regulated. *In re Kollock,* 165 U. S. 526, 536, 537 (17 Sup. Ct. 444)." *Davis* v. *Massachusetts,* 167 U. S. 43 (17 Sup. Ct. 731).

See, also, *Com.* v. *Brooks,* 109 Mass. 355; *Com.* v. *Abrahams,* 156 Mass. 57 (30 N. E. 79); *Wilson* v. *Eureka City,* 173 U. S. 32 (19 Sup. Ct. 317).

It.was within the power of the common council to pass the ordinance. It was the duty of the recorder to proceed with the trial of the cause. *People* v. *Swift,* 59 Mich. 529 (26 N. W. 694); *Sadler* v. *Sheahan,* 92 Mich. 630 (52 N. W. 1030). It is so directed.

MONTGOMERY, C. J., HOOKER and LONG, JJ., concurred. GRANT, J., did not sit.