## STATE v. ABE SUGARMAN and Others.[1]

July 17, 1914.

Nos. 18,701—(9).

**City of Minneapolis — ordinance — free passage of streets.**

1. Both under the express and implied authority of its charter the city council of the city of Minneapolis may enact ordinances to secure unobstructed passage on its streets. The purpose of the ordinance here involved was to keep the streets open for public travel.

**Same — power of police.**

2. The ordinance, in providing that when three or more persons stand

[1] Reported in 148 N. W. 466.

---

Note.—Upon the right of a municipal corporation to prevent loitering in streets, see note in 15 L.R.A.(N.S.) 973.

together so as to obstruct free passage, a police officer may arrest if, after requesting the persons to move on, they neglect or refuse to do so, does not confer an arbitrary power upon the officer. The gravamen of the offense is obstructing free passage and not disobeying an officer. When the obstruction exists, the officer must warn, and, if the obstruction still remains, he must arrest.

**Conviction sustained by evidence.**

3. The evidence was sufficient to support a conviction under proper instructions.

**Correction of charge to jury.**

4. Prejudicial error was committed in refusing to correct an omission in an instruction after attention was called thereto before the jury retired.

**Rulings on evidence.**

5. No reversible error was made in receiving or excluding evidence offered at the trial.

Defendants were tried and convicted in the municipal court of Minneapolis, before Bardwell, J., and a jury, of a violation of the city ordinance mentioned in the opinion. From an order denying their motion for a new trial and from judgments against each defendant, they appealed. Reversed.

*Mead & Bryngelson* and *John R. Coan,* for appellants.

*Daniel Fish,* City Attorney, and *John T. O'Donnell,* Assistant City Attorney, for respondent.

HOLT, J.

The defendants were convicted in the municipal court of the city of Minneapolis for a violation of this city ordinance: "Three or more persons shall not stand together or near each other in any street or on any foot walk or sidewalk in said city, so as to obstruct the free passage for foot passengers, and any person or persons so standing shall move on immediately after request to do so made by the mayor, chief of police, or any police officer or watchman."

The appeal questions: (1) The validity of the ordinance; (2) the sufficiency of the evidence; and (3) certain rulings on the trial and instructions of the court to which appellants took exception.

The main attack is directed against the ordinance. It is contended

that the city had no power to enact it; that the power conferred in the first part of section 5, chapter 4, of the charter upon the city council to enact such ordinances "for the government and good order of the city * * * as it shall deem expedient" is limited to the subjects enumerated in the 47 subdivisions thereof; and therefore unless authority is found in one of those, none exists.

Unquestionably, authority has been given villages of less than 3,000 inhabitants to adopt ordinances, under the general welfare clause, regulating the use of streets so as to secure free and safe travel thereon, Village of Fairmont v. Meyer, 83 Minn. 456, 86 N. W. 457, where, however, this clause was found not at the beginning of the section, but in one of the subdivisions (subd. 28, § 1224, G. S. 1894). It would seem incredible that villages have been granted the power to regulate the use of their streets, and it has been withheld from the most populous city in the state. The regulation of traffic upon the crowded thoroughfares of a large city is so imperative that a court should hesitate to deny that this is among one of the police powers granted to the same. In State v. Larrabee, 104 Minn. 37, 115 N. W. 948, where an ordinance relating to the running of vehicles upon the streets was involved, the court and eminent counsel assumed its enactment authorized. It is true, the powers of municipalities are confined to those specifically conferred, and these are, generally speaking, not extended by construction; but certain matters are so intimately connected with the exercise of municipal government and control that we do not necessarily look for express legislative authority on the subject. It is implied. As to authority to enact the ordinance in question we assert that not only may express authority for its enactment be found in the charter, but, we believe, also implied.

The purpose of the ordinance must be kept in view. It is to secure to the public the use of the streets for unobstructed travel. Streets and highways are dedicated, secured and maintained primarily for public transit, and must be so preserved. All other uses thereof must be subordinated or yield to the right of free and unobstructed passage. This ordinance must be considered as in aid of this primary

use of the streets, and not as a prohibition or regulation of assemblies therein, except as these interfere with public travel.

Express authority to enact this ordinance may be found in these provisions of the charter: Section 1, chapter 1, gives the city "all the general powers possessed by municipal corporations at common law, and in addition thereto" it shall possess all powers specifically granted; the government and good order clause in the beginning of section 5, chapter 4, already referred to; and the power over public nuisances directly conferred after the 47 specifications mentioned. State v. Merrill, 37 Me. 329. Under the charter authority "to ordain and publish such acts, laws and regulations, not inconsistent with the Constitution and laws of this state, as shall be needful to the good order" of the city, it can, subject to these restrictions and certain statute regulations, says Howard, Justice, "establish all suitable ordinances for administering the government of the city and preservation of the health of the inhabitants and the convenient transaction of business within its limits and the performance of the general duties required by law of municipal corporations." The foregoing may cover implied power as well as does also the following from section 458, McQuillan Municipal Ordinances: "It is undoubtedly true that the police power extends to all reasonable regulations relating to the keeping the sidewalks, streets and public ways free from obstructions and nuisances and to all proper restraining regulations relative to the use thereof." To the same purpose may be cited 3 Abbott, Municipal Corporations, §§ 865, 870; Tiedeman, Municipal Corporations, §§ 290, 300; Commonwealth v. Davis, 162 Mass. 510, 39 N. E. 113, 26 L.R.A. 712, 44 Am. St. 389, also found in Davis v. Massachusetts, 167 U. S. 43, 17 Sup. Ct. 731, 42 L. ed. 71; Barker v. Commonwealth, 19 Pa. St. 412; Love v. Phalen, 128 Mich. 545, 87 N. W. 785, and City of Chariton v. Simmons, 87 Iowa, 226, 54 N. W. 146. The clause, "government and good order of the city" found in the first part of section 5, chapter 4, should not be restricted to the subjects thereinafter specifically enumerated. There is no specific restriction, and the regulation of traffic on the congested streets of a large city is so bound up with the good order thereof that the authority, wherever found in the

charter, should be held to grant the power so to do. The only decision opposed to this view is the City of Red Wing v. Chicago, M. & St. P. Ry. Co. 72 Minn. 240, 75 N. W. 223, 71 Am. St. 482, of which mention will be made hereafter. It might also be said that the power given to prevent public nuisances, as above indicated, is sufficient authority for the enactment of the ordinance. Obstructions of public streets, whether by inanimate objects or by persons, would seem to come within the definition of a public nuisance. Section 8759, G. S. 1913. Implied authority also exists, as appears from the foregoing authorities, under the necessities of the case. The city is specifically charged with the care and maintenance of the streets for public travel, and, as a necessary incident, it would seem, proper regulations are indispensable so that travel may not be impeded or obstructed. The power to make rules and enforce them is required both for the convenience of travel and the protection of the streets. Common observation of the conditions in the business centers of our large cities so clearly demonstrates this that nothing further need be said. We conclude that the city council had power to enact the ordinance, not only from the express grant in the charter but also as "incidental and necessary to the proper enjoyment * * * of such [powers] as are expressly conferred." City of St. Paul v. Traeger, 25 Minn. 248, 33 Am. Rep. 462. No former decision of this court is to the contrary, save one. State v. Hammond, 40 Minn. 43, 41 N. W. 243, is not authority for the proposition that no power to enact this ordinance can be found in the clause quoted from the first part of section 5, chapter 4, of the charter. That was a case where specific authority was given to prohibit certain offenses in public places and an ordinance undertook to also cover the same acts in places not public, and this was held to exceed the express power granted. In Green v. Eastern Ry. Co. of Minn. 52 Minn. 79, 53 N. W. 808, it was held that the general safety clause contained in a section of the charter of Anoka authorized an ordinance requiring a railroad flagman at a street crossing, although no authority was found in the section enumerating the subjects within the city's legislative control, and although one of these enumerated subjects contained a kindred matter, namely, the regulation of the

126 M.—31.

speed of trains in the city and the blocking of street crossings by trains. The only decision which takes a narrow view of the so-called welfare clause and one not in harmony with the view herein expressed is City of Red Wing v. Chicago, M. & St. P. Ry. Co. supra. It was there held that neither the fact that the city was authorized to enact ordinances, rules and by-laws for "the government and good order of the city," nor the fact that control and management of the streets was vested in the city, nor the fact that the city had the general powers possessed by municipal corporations at common law authorized the enactment of an ordinance requiring the railroad company to keep a flagman at a street crossing. If there was need of distinguishing that case from the one in hand, it might readily be done on the ground that the requirement of a flagman at a railroad crossing pertains to the safety of the public, and not to the good order or government of the city, whereas the regulation of travel on the streets comes distinctly within the latter designation. But it is evident that the doctrine of the Red Wing case had been repudiated, although no express reference is made thereto by State v. St. Paul, M. & M. Ry. Co. 98 Minn. 380, 108 N. W. 261, 28 L.R.A. (N.S.) 298, 120 Am. St. 581, 8 Ann. Cas. 1047, where it was held that in the interest of the safety of the public the city council had authority to require railroads to bridge street crossings, although no express provision is found in any of the enumerated subjects, and although power is expressly granted to care for the safety of such crossings by requiring flagman and gates.

It is also contended, and it is made the important point, that the ordinance confers an arbitrary power on the police officer, that it lays a person liable to arrest for standing still but for an instant after the order to move on, even if those who stood near and obstructed the walk had left. It is elementary that every ordinance must be reasonable, not arbitrary, its terms must be definite and certain, and its enforcement not left to the whim or caprice of officials. The ordinance is directed against the offense of obstructing the free passage of the streets, not against disobedience of the orders of police officers. Police officers have the powers and duties of constables at common law. This includes the duty to arrest violators.

of laws and ordinances. As to this ordinance, however, their power is limited so that an arrest may not be made, unless the offender is first warned and given an opportunity to desist. But the officer has no right to give the warning, unless by the act of three or more an obstruction to travel in the street is created, nor to arrest, unless it is maintained after warning. By common usage one of a police officer's chief duties in crowded streets is to direct travel for convenience and safety. The case of City of Chariton v. Simmons, supra, is very much in point. We do not think there is any discretion given the officer. He must act. When the obstruction is created he must warn, and if that does not abate it, he must arrest. That a warning must first come from an officer, before an offender against this ordinance may be arrested, is not different in principle from the provision in an ordinance that prosecutions for a violation thereof can be instituted only by a police officer. State v. Robitshek, 60 Minn. 123, 61 N. W. 1023, 33 L.R.A. 33. That a police officer may designate places where hacks shall stand does not make an ordinance relating to hackmen vulnerable. City of St. Paul v. Smith, 27 Minn. 364, 7 N. W. 164, 38 Am. Rep. 296. Cases are to be found that contain regulative ordinances which leave it with some one in authority to permit that which is otherwise forbidden. Commonwealth v. Ellis, 158 Mass. 555, 33 N. E. 651; State v. Yopp, 97 N. C. 477, 2 S. E. 458, 2 Am. St. 305. However, this ordinance deals with obstructions to free passage only, so that the question of prohibiting a lawful use, except by discretion of some official, is not involved, as was the case in City of Chicago v. Trotter, 136 Ill. 430, 26 N. E. 359; Anderson v. Wellington, 40 Kan. 173, 19 Pac. 719, 2 L.R.A. 110, 10 Am. St. 175; State v. Dering, 84 Wis. 585, 54 N. W. 1104, 19 L.R.A. 858, 36 Am. Rep. 948; In re Frazee, 63 Mich. 396, 30 N. W. 72, 6 Am. St. 310.

The convictions cannot be set aside for lack of proof. All except one defendant met on a street corner, usually crowded, for the purpose of testing this ordinance. They conceived that it was directed against free speech and orderly assembly. But, as already stated, the ordinance is not directed against anything of the kind except in so far as those engaged in thus propagating their views

encroach on the right of free passage over public streets. The evidence must be held to warrant the jury in finding that the defendants, and each of them, were of those who blocked passage, and persisted in doing so after warning by police officers to move on.

The objection that the ordinance is unreasonable and void, because it applies also to streets in sparsely settled portions of the city where there is no danger of obstruction, is not sustained. The streets outside of the business center may be clogged in the same manner as was here attempted and free passage obstructed. Furthermore the ordinance must receive a reasonable construction so as to subserve its purpose. If ordinances should be so exact as to define minutely every evil intended to be reached at every place in the city, the city's by-laws might be so increased that neither police officers nor the ordinary citizen could keep them in mind, and some think we have nearly reached that stage now. But even if it be conceded that the ordinance would be unreasonable as to the streets in the outskirts of the city, it does not follow that it is void as to streets near the center. In Pennsylvania Ry. Co. v. Jersey City, 47 N. J. L. 286, an ordinance restricting the blocking of streets by railway trains to three minutes was attacked, as a whole, on the ground that it was unreasonable as to three crossings near the depot, and the court said: "But conceding this allegation to be true, that the business of the plaintiff in error at this particular locality is by that ordinance unreasonably embarrassed and burthened, such a vice in the by-law would not render it generally, but only specially inefficacious * * * that is, the court would not vacate the entire ordinance, but merely refuse to put it in effect in that part of it that was thus unreasonable." State v. Sheppard, 64 Minn. 287, 67 N. W. 62, 36 L.R.A. 305.

It may be a debatable question whether the jury receives any aid from an instruction under the maxim "falsus in uno, falsus in omnibus," given in the approved form. But if an attempt is made it should not be misleading. In the instant case the court said: "If you believe that any witness has testified falsely as to any material fact, you have a right to disregard all the testimony of such witness so testifying falsely or to give his testimony or any part

thereof such weight only as the same in your opinion may be entitled to." Before the jury retired counsel for defendants said: "I want to take an exception to the court's charge, defining the test of credibility of a witness. If a witness has knowingly testified falsely, then his testimony should be disregarded." It may well be that people generally understand the term, testifying falsely, to mean the commission of perjury. But it is plain that, if the jury so understood when the charge was completed, they must have come to a different conclusion when, in their hearing, the court refused to modify the instruction so as to make the knowledge of the falsity of the matter testified to an ingredient of perjury. This necessitates a new trial. There would seem to be no need of adverting to other errors assigned which either are of no merit or are not likely to again arise. However, we might say that the fact, if it be true, that others violated this ordinance without being arrested is no defense and not material. Because one offender is not prosecuted, does not entitle another to a discharge. Since it appears that by the concerted action of persons professing the same social creed matters were manipulated so as to bring before the court a test case, we see no impropriety in inquiring of witnesses on cross-examination if they were of the same party. It bore on the credibility of their testimony.

Order reversed and a new trial granted.