156 So.2d 448

**STATE of Louisiana**

**v.**

**B. Elton COX (two cases).**

**Nos. 46395, 46396.**

June 28, 1963.

Rehearing Denied Oct. 9, 1963.

attorney of East Baton Rouge Parish with obstructing public passages as defined and prohibited by LSA–R.S. 14:100.1. He was convicted, sentenced to pay a fine of $500 and to be imprisoned in the parish jail for a period of five months, and, in default of the payment of the fine, to be imprisoned an additional five months. An appeal was taken in this case and is docketed in this court under Number 46,395.

By separate bill of information Cox was charged with disturbing the peace as defined and prohibited by LSA–R.S. 14:103.1. He was convicted, sentenced to pay a fine of $200 and to imprisonment in the parish jail for a period of four months, and, in default of the payment of the fine, to be confined in the parish jail for four months. The accused having no right of appeal in this latter case, made application to this court for writ of certiorari, mandamus and prohibition which we granted under our supervisory powers to review the correctness of certain actions below.[2] This case bears Docket Number 46,396 in this court.

Collins, Douglas & Elie, New Orleans, Murphy W. Bell, Baton Rouge, Carl Rachlin, New York City, for defendant-appellant and in support of application for supervisory writs.

Jack P. F. Gremillion, Atty. Gen., M. E. Culligan, Asst. Atty. Gen., Sargent Pitcher, Jr., Dist. Atty., Ralph L. Roy, Asst. Dist. Atty., for appellee and opponent.

SUMMERS, Justice.

In these consolidated cases [1] defendant, B. Elton Cox, was charged by the district

---

1. There were four bills of information filed against the accused that were consolidated for trial below. On one charge involving criminal conspiracy the accused was acquitted; another charge of obstructing justice is on appeal in this court and is separately docketed; the remaining two of the four charges are the subject of this opinion.

2. In both of these cases the accused was incarcerated in the parish prison pursuant to the sentences which were decreed to run consecutively. But, originally, because of the trial court's failure to allow proper delay after verdict and before sentence as required by LSA–R.S. 15:521 we granted writs of habeas corpus in both of these cases. In our review of the trial court's action (See State ex rel. Cox v. Clemmons, 243 La. 264, 142 So.2d 794 (1962)) the writs were made peremptory, the sentences were annulled and set aside and the accused was ordered released on bail until such time as legal sentences were imposed and the accused was afforded an opportunity to take the procedural steps necessary to

The bill of information in No. 46,395 charges that defendant "did violate the provisions of R.S. 14:100.1 in that he did wilfully obstruct the free, convenient and normal use of a public sidewalk within the City of Baton Rouge, thereby impeding, hindering and restraining passage thereon."

The pertinent parts of the statute relied upon by the State provide:

"No person shall wilfully obstruct the free, convenient and normal use of any public sidewalk, street, highway, bridge, alley, road, or other passageway, or the entrance, corridor or passage of any public building, structure, water craft or ferry, by impeding, hindering, stifling, retarding or restraining traffic or passage thereon or therein.

"Providing however nothing herein contained shall apply to a bona fide legitimate labor organization or to any of its legal activities such as picketing, lawful assembly or concerted activity in the interest of its members for the purpose of accomplishing or securing more favorable wage standards, hours of employment and working conditions. * * *" LSA–R.S. 14:100.1.

The bill of information in No. 46,396 charges that defendant "violated R.S. 14:-

103.1, * * * in that he did under circumstances such that a breach of the peace could be occasioned congregate with others in and upon a public street and upon public sidewalks in front of the Courthouse in the Parish of East Baton Rouge, a public building, and in and around certain entrances of places of business and failed and refused to disperse and move on when ordered to do so by the Sheriff of East Baton Rouge, a person duly authorized to enforce the laws of this State."

The pertinent portion of the statute upon which this charge is based provides:

"A. Whoever with intent to provoke a breach of the peace, or under circumstances such that a breach of the peace may be occasioned thereby: (1) crowds or congregates with others, providing however nothing herein contained shall apply to a bona fide legitimate labor organization or to any of its legal activities such as picketing, lawful assembly or concerted activity in the interest of its members for the purpose of accomplishing or securing more favorable wage standards, hours of employment and working conditions, in or upon a shore protection structure or structures, or a public street or public highway, or upon a public sidewalk, or any other

bring the matter before this court either on appeal or by writ application.

When the cases were again resumed below, the accused filed certain motions,

perfected bills of exceptions and, in due time, was again sentenced as outlined in the body of this opinion.

public place or building, or in any hotel, motel, store, restaurant, lunch counter, cafeteria, sandwich shop, motion picture theatre, drive-in, beauty parlor, swimming pool area, or any sports or recreational area or place, or any other place of business engaged in selling or serving members of the public, or in or around any free entrance to any such place of business or public building, or to any building owned by another individual, or a corporation, or a partnership or an association, and who fails or refuses to disperse and move on, or disperse or move on, when ordered so to do by any law enforcement officer of any municipality, or parish, in which such act or acts are committed, or by any law enforcement officer of the state of Louisiana, or any other authorized person * * * shall be guilty of disturbing the peace * * *."

The defendant filed motions to quash and motions for bills of particulars to each of these bills of information prior to trial. These motions were overruled and the cases proceeded to trial, where these facts were established.

On the morning of December 15, 1961, the defendant, Cox, as the unquestioned leader, with a crowd of Negroes variously estimated at 1,500 to 3,800 (we think 2,000 persons is a fair conclusion to be derived from the evidence) assembled in the heart of Baton Rouge in the vicinity of the Old State Capitol Building, a short distance from the parish courthouse. Shortly before noon, Cox led these demonstrators in an orderly fashion to the vicinity of the parish courthouse, where the sheriff, chief of police and a substantial contingent of approximately eighty law enforcement officials had gathered in preparation for the march upon the courthouse. Twenty-three Negroes had been arrested the day before for demonstrations in Baton Rouge and they were at that time imprisoned in the parish jail located in the upper floor of the courthouse building.

Arriving near the courthouse in the vanguard of the marchers, Cox was confronted by the sheriff and chief of police and was asked what his intentions were. He announced to them that the marchers were demonstrating against segregation and their activities would be confined to a few songs, a speech, and peaceful demonstrations, the whole of which would consume only a few minutes. The sheriff then advised Cox to confine his demonstration to the time mentioned and no more.

The marchers then occupied the sidewalk across the street from the western entrance of the courthouse. The testimony and motion pictures in evidence unmistakably establish the fact that the marchers completely occupied the entire sidewalk for the greatest portion of a block across from the courthouse in such a

manner that no passage was possible thereon. All of the entrances to many offices facing that sidewalk were blocked, their occupants being unable to enter or leave. In the words of one witness the demonstrators were "tightly packed" along most of the sidewalk. Unmistakably, too, these activities resulted in an obstruction of the street separating the sidewalk occupied by the marchers and the courthouse. Because of this, it was necessary to reroute traffic away from that street. Meanwhile, several hundred white persons had gathered in front of the courthouse across the street from the demonstrators.

There were silent prayers and a display of signs, which the demonstrators had kept hidden in their clothing. These signs being the identical ones used by the demonstrators who had been arrested the day before. All of these activities took place under Cox's command and according to instructions he issued during each phase of the demonstration.

Cox then made a speech which was in effect "a protest against the illegal arrest of some of their members." He admonished the multitude of demonstrators to remain peaceful, and generally built them up emotionally for further sit-in demonstrations which he instructed them to conduct at lunch counters in the business district of the city upon leaving the scene.

The crowd then sang songs, answered by the prisoners in the jailhouse, and this in turn evoked loud and frenzied outbursts and "wild yells" from the demonstrators assembled on the sidewalks.

Whereupon "grumbling" was heard among the white people, a feeling of "impending excitement" was apparent to all and a fear arose among those present that they were "about to have a riot." Several witnesses testified that in their lifetime no demonstration of this nature or scope had ever taken place in Baton Rouge. As one witness expressed it the crowd was "rumbling." In the large crowd the "tension was running high." Some of the witnesses felt the demonstrators were about to storm the courthouse to get the prisoners who had been arrested the day before.

At this time the prisoners in jail were "hollering", "screaming", "beating on bars", "beating on walls and so on" trying to attract the attention of the demonstrators across the street.

The sheriff, feeling that a riot was imminent, and fearing the crowd would get out of hand instructed Cox by means of a loudspeaker so that all present could hear to "move on" and "break it up", that he had had his time. Cox then instructed the demonstrators by saying "Don't move" and by his actions and demeanor defied the sheriff's orders. The demonstrators and Cox stood immobile. They refused to move on.

The police then dispersed the crowd with tear gas and Cox was arrested the next day.

Four causes are assigned by the accused for setting aside the conviction below.

First, it is asserted that the specific laws under which he was charged, tried and convicted (LSA–R.S. 14:100.1 and LSA–R.S. 14:103.1) are unconstitutional in their application, for the conviction thereunder infringes upon the defendant's right of free speech protected by the First Amendment of the United States Constitution which the States cannot deny its citizens because of the due process and equal protection clauses of the Fourteenth Amendment of the Constitution of the United States.

Second, the claim is made that these laws and the bills of information are too vague and general and hence violate the due process and equal protection clauses of the Fourteenth Amendment.

Third, it is contended that Cox's trial and conviction were violative of the Fourteenth Amendment for there was no evidence tending to prove the crime charged.

Fourth, it is contended that the segregated conditions in the courtroom during the trial denied Cox a fair trial in violation of the Sixth and Fourteenth Amendments.

Defendant's first contention is based upon the proposition that the statutes (LSA–R.S. 14:100.1 and LSA–R.S. 14:103.1) prohibiting the obstructing of public passage and disturbing the peace, under which defendant was convicted, are unconstitutional in their application in this case. The defendant asserts that if those statutes are construed to convict defendant for his action in obstructing the sidewalks while demonstrating against segregation it deprives him of the freedom of assembly and freedom of speech and the right to peacefully picket guaranteed by the First Amendment to the Constitution of the United States. Under the due process and equal protection of the laws clause of the Fourteenth Amendment, it is contended, the State of Louisiana must afford the right of freedom of speech to this defendant. Defendant relies upon the case of Thornhill v. Alabama, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093 (1940), holding that peaceful picketing was within the liberties protected by the First and Fourteenth Amendments. The argument is advanced that such interest as the State of Louisiana has in protecting the public peace is not substantial enough to justify this prosecution which has the effect of denying to the accused the guarantees of freedom of speech and expression.

Thus we understand the contention to be that even though the statute might be constitutionally enforced under other circumstances, it cannot be invoked to punish this demonstration which the defendant

asserts is no less an expression than is speech against segregation; and this freedom of expression, like freedom of speech, is protected by the First Amendment. Citing concurring opinion of Mr. Justice Harlan in Garner v. Louisiana, 368 U.S. 157, 82 S.Ct. 248, 7 L.Ed.2d 207 (1961).

■ The United States Supreme Court has long ago announced that these First Amendment freedoms are protected by the Fourteenth Amendment from invasion by the States. Edwards v. South Carolina, 372 U.S. 229, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963); Thornhill v. Alabama, supra; Cantwell v. Connecticut, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed 1213 (1940); DeJonge v. Oregon, 299 U.S. 353, 57 S.Ct. 255, 81 L.Ed. 278 (1937); Stromberg v. California, 283 U.S. 359, 51 S.Ct. 532, 75 L. Ed. 1117 (1931); Whitney v. California, 274 U.S. 357, 47 S.Ct. 641, 71 L.Ed. 1095 (1927); Gitlow v. New York, 268 U.S. 652, 45 S.Ct. 625, 69 L.Ed. 1138 (1925).

■ But the right of freedom of speech is not absolute and a State may by general and non-discriminatory legislation, under its police power, regulate the exercise of that freedom. Cantwell v. Connecticut, supra.

Our inquiry, then, must be directed to the regulation of the constitutional guarantee and a careful consideration of whether that regulation is within the allowable area of state control. And so in this inquiry we must look to the conduct to be limited or proscribed.

■ The statutes in question do not come within the objection that they punish conduct which is so generalized as to be "not susceptible of exact definition" as was the case in Edwards v. South Carolina, supra. To the contrary, in each instance the proscribed conduct is precisely and narrowly defined for it is to "obstruct * * * any public sidewalk * * * by impeding, hindering, stifling, retarding or restraining traffic or passage thereon" in one instance which is proscribed and it is those who "under circumstances such that a breach of the peace may be occasioned thereby: (1) crowds or congregates with others * * * in or upon * * * a public sidewalk" who are guilty of disturbing the peace in the other instance. See also Garner v. Louisiana, 368 U.S. 147, 82 S.Ct. 248, 7 L.Ed.2d 207 (1961), Town of Ponchatoula v. Bates, 173 La. 824, 138 So. 851 (1932).

Laws having the character of those under attack have been before the courts of last resort in other States, and have been upheld as reasonable regulations in the exercise of police power. City of Tacoma v. Roe, 190 Wash. 444, 68 P.2d 1028 (1937); State v. Sugarman, 126 Minn. 477, 148 N.W. 466, 52 L.R.A., N.S., 999 (1914); Benson v. City of Norfolk, 163 Va. 1037, 177 S.E. 222 (1934).

In the statutes under consideration there is no discrimination, but where labor picketing is concerned a clearly defined exclusion recognized in Thornhill v. Alabama, supra, is set forth.

In Edwards v. South Carolina, supra, the court announced that no infringement upon constitutional guarantees would be involved "If, for example, the petitioners had been convicted upon evidence that they had violated a law regulating traffic, or had disobeyed a law reasonably limiting the periods during which the State House grounds were open to the public * * *." And this is the precise nature of the regulation which these contested statutes invoke. The reasons which support such enactments are obvious and have been approved on many occasions. They are that:

"Municipal authorities, as trustees of the public, have the duty to keep their communities' streets open and available for movement of people and property, the primary purpose to which the streets are dedicated. So long as legislation to this end does not abridge the constitutional liberty of one rightfully upon the street to impart information through speech or the distribution of literature, it may lawfully regulate the conduct of those using the streets. For example, a person could not exercise this liberty by taking his stand in the middle of a crowded street, contrary to traffic regulations, and maintain his position to the stoppage of all traffic; a group of distributors could not insist upon a constitutional right to form a cordon across the street and to allow no pedestrian to pass who did not accept a tendered leaflet; nor does the guarantee of freedom of speech or of the press deprive a municipality of power to enact regulations against throwing literature broadcast in the streets. Prohibition of such conduct would not abridge the constitutional liberty since such activity bears no necessary relationship to the freedom to speak, write, print or distribute information or opinion." Schneider v. State, 308 U.S. 147, 160, 60 S.Ct. 146, 150, 84 L.Ed. 155 (1939).

And on this authority, and others, it is manifest that the right to freely speak against segregation, if that was the true motive of the demonstrators in the case at bar, bears no relation to facts involving two thousand persons marching against the halls of justice and obstructing the public sidewalks there in such a manner that a violation of the statute proscribing that conduct is manifest. These demonstrators, like other citizens, must confine their exercise of constitutional freedoms within lawfully regulated limits of those freedoms.

In support of the second grounds for setting aside this conviction, it is asserted

that these laws and the bills of information are too vague and general and hence violate the due process and equal protection clauses of the Fourteenth Amendment.

■ LSA–R.S. 14:103.1 is said to be ambiguous for it is not clear whether the prosecution must show an actual disturbance or only circumstances such that a disturbance may be occasioned. In either event, however, we think there is no ambiguity in that language of the statute for to "disturb the peace" in Louisiana means "* * * to agitate, to arouse from a state of repose, to molest, to interrupt, to hinder, to disquiet." Town of Ponchatoula v. Bates, 173 La. 824, 138 So. 851 (1932). To "breach the peace" has the identical meaning in our view and the statute so declares, for it provides that "Whoever with intent to provoke a breach of the peace, or under circumstances such that a breach of the peace may be occasioned thereby" commits certain acts "shall be guilty of disturbing the peace." Because the words of the statute have a fixed, definite and commonly understood meaning and a meaning ascribed to them by this court, they are not ambiguous nor is it objectionable that the statute seeks to proscribe conduct which will result in a disturbance of the peace. The statute may lawfully have the prevention of a disturbance as its object as well as punishing an actual disturbance. Therefore the accused had adequate notice of the proscribed conduct. Garner v. State of Louisiana, 368 U.S. 157, 82 S.Ct. 248, 7 L.Ed.2d 207 (1961).

■ With respect to LSA–R.S. 14:-100.1 the contention is made that the bill of information charging a violation of that statute is fatally defective because it fails to inform defendant of the nature and the cause of the accusation against him, though it is conceded that the statute may be sufficient to describe or legally characterize the offense. U.S.Const. amend. VI; LSA–Const. of 1921 art. I, § 10; LSA–R.S. 15:2, LSA–R.S. 15:5 and LSA–R.S. 15:227.

The Louisiana Constitution, like the United States Constitution, provides that in all criminal prosecutions the accused has a right to be informed of the nature and cause of the accusation.

The argument is advanced here that one cannot be charged with obstruction "of a public sidewalk within the City of Baton Rouge * * *." One must be charged with obstruction of a particular sidewalk, i. e., "* * * that sidewalk on the West side of St. Louis Street, in the City of Baton Rouge, Louisiana, identified by municipal number 200, bounded on the North by * * * and bounded on the south by * * *." But we cannot agree with the contention; the quoted language of the bill of information in the beginning of this opinion refers to the sidewalk in

"front of the Courthouse", which, together with the date of the occurrence, is definite and clear and furnishes the requisite information to satisfy the constitutional test, which is threefold:

■ First, the statement of the accusation should inform the accused of the charges that will be brought against him at the trial in order that he may properly defend himself. Second, the trial judge should be informed by the indictment of what the case involves, so that, as he presides and is called upon to make rulings, he may do so intelligently. Third, the indictment should form a record from which it can be clearly determined whether or not a subsequent proceeding is barred by the former adjudication.

When the accusation fulfills these purposes, it satisfies the constitutional mandate that the accused must be informed of the nature and cause of the accusation. State v. Scheler, 243 La. 443, 144 So.2d 389 (1962).

■ The third contention that there was no evidence tending to prove the crime charged is without merit.

■ This court is limited in the scope of its review in criminal matters by Article VII, Section 10 of the Constitution of this State "to questions of law only." Although it is recognized in our jurisprudence that a proper interpretation of the foregoing constitutional provision permits a complaint that a conviction based upon "no evidence at all" presents the question of law whether it be lawful to convict an accused without any proof whatsoever as to his guilt, it is firmly established that it is only when there is no evidence at all upon some essential element of the crime charged that the court may set aside a verdict. But, where there is *some* evidence to sustain the conviction, *no matter how little,* this court cannot pass upon the sufficiency thereof. That comes within the exclusive province of the trial judge or jury. State v. Copling, 242 La. 199, 135 So.2d 271 (1961).

Undoubtedly, from the facts recited, there is some evidence. In our view there is ample evidence to sustain this conviction.

■ The final grounds relied upon to reverse this conviction is that racial segregation existed in the court where defendant was tried and convicted and this segregation denied him a fair trial in violation of the due process and equal protection clauses of the Fourteenth Amendment to the Constitution of the United States.

The record undoubtedly establishes that racial segregation existed in the courtroom as it had for many years.

On April 29, 1963, the United States Supreme Court held that "State-compelled segregation in a court of justice is a manifest violation of the State's duty to deny

no one the equal protection of its law." Johnson v. Virginia, 373 U.S. 61, 83 S.Ct. 1053, 10 L.Ed.2d 195. But in the Johnson case the objection to segregation was made by a Negro who had been arrested for contempt of court for sitting in seats assigned for white citizens, and the arrest and conviction was for that conduct. In the case before us, there is no charge against the defendant for having violated the court-imposed seating arrangement and none of the parties upon whom the segregation was imposed are before this court in this case. Hence the Johnson case is not authority for reversing this conviction. It has not been made to appear that the segregation resulted in a miscarriage of justice to this defendant. LSA–R.S. 15:-557. If it were otherwise, it would result that every Negro convicted in that court in the past would be entitled to have his conviction set aside.

For the reasons assigned the conviction and sentence are affirmed.

McCALEB, Justice (dissenting).

The ruling herein that the bill of information is sufficient to apprise the accused of the nature and cause of the accusation against him is in conflict with our recent decision in State v. Smith, 243 La. 656, 146 So.2d 152, handed down on November 5, 1962.

In the Smith case the defendants were charged in a bill of information containing two counts with violating (1) R.S. 14:-100.1 (obstructing public passages) and (2) R.S. 14:103.1 (disturbing the peace) under allegations similar to those made in the separate bills of information which have been upheld in the instant matter. The Court, after setting forth the settled jurisprudence of this State to the effect that it is not a sufficient compliance with the constitutional mandate of Section 10 of Article 1 of the State Constitution (that the accused shall be informed of the nature and cause of the accusation against him) for the bill of information to be couched in the language of the statute when the statutory words do not, themselves, set forth the elements necessary to constitute the offense intended to be punished (see, among other cases, State v. Verdin, 192 La. 275, 187 So. 666; State v. Varnado, 208 La. 319, 23 So.2d 106 and State v. Blanchard, 226 La. 1082, 78 So.2d 181), quashed the bill of information, holding that the provisions of R.S. 14:100.1 and 14:103.1 were not specific enough to support a charge drawn in their language and that allegations of the particular facts were required in order to comply with the Constitution.

The motion to quash should be sustained.