THE PEOPLE OF THE STATE OF NEW YORK, Plaintiff, v. BENJAMIN NAHMAN, ALBERT SHAFRAN, NELSON LEVITT, CHARLES INTRATOR, MORRIS J. SCHWARTZ, MILTON SELIGMAN, NORMAN STERNBACH, MORRIS DIMOWITZ, NATHAN LITWACK, IRWIN GREENBERG, JOSEPH E. NAHAM, SOL WOLLIS and BERNARD SILVERMAN, Defendants.

City Magistrate's Court of New York, Borough of Manhattan, May 10, 1946.

*Bertram Bakerman* and *Moses C. Weinman* for Benjamin Nahman, defendant.

*James H. Quinn,* of the Legal Bureau of the Police Department of the City of New York, for plaintiff.

SIMMONS, M. This is a motion by the defendants to dismiss complaints charging them with violation of section 21 of article III of the Rules and Regulations of the Department of Parks of New York City. By stipulation of the parties it was agreed that the testimony taken in the proceeding against Benjamin Nahman be considered the testimony in the twelve other cases and the decision of the court thereon be binding on the twelve other defendants. The basis of the charge is that at noon of March 15, 1946, while Winston Churchill, former Prime Minister of the United Kingdom, was entering the City Hall to receive the official greetings of the City of New York, the defendants near its steps in the park, held aloft placards, bearing inscriptions of the following nature: "No AMERICAN SHALL DIE FOR CHURCHILL'S EMPIRE " and shouted: " CHURCHILL WANTS WAR, WE WANT PEACE ". The challenged regulation reads, " Section 21. *Meetings, Exhibitions, Parades, Racing, etc.* No person shall erect any structures, stand or platform, hold any meeting,

perform any ceremony, make a speech, address or harangue; exhibit or distribute any sign, placard, notice, declaration or appeal of any kind or description; exhibit any dramatic performance, or the performance in whole or in part of any interlude, tragedy, comedy, opera, ballet, play, farce, minstrelsy, dancing, entertainment, motion picture, public fair, circus, juggling, rope-walking, or any other acrobatics, or show of any kind or nature; or run or race any horse, or other animal, or, being in or on a vehicle, race with another vehicle or horse, whether such race be founded on any stake, bet, or otherwise; in any park or upon any park street except by permit. No parade, drill or maneuver of any kind shall be conducted, nor shall any procession form for parade or proceed in any park or park street without a permit."

That regulation is based on chapter 21 of the New York City Charter (1938), section 532 whereof sets forth that the Commissioner shall have the power and it shall be his duty: " 3. To maintain the beauty and utility of all parks, squares, public places and playgrounds and other recreational properties, except those within the jurisdiction of the department of education, and to institute and execute all measures for the improvement thereof for ornamental purposes and for the beneficial uses of the people of the city " and section 534 whereof provides in part: " a. The commissioner shall have power to establish and enforce rules and regulations for the government and protection of public parks and of all property under the charge or control of the commissioner, which rules and regulations so far as practicable shall be uniform in all boroughs and shall have the force and effect of law."

The defendants contend that the regulation, first quoted, violates the First and the Fourteenth Amendments to the Constitution of the United States, in that it represses the rights of free press, free speech and free assembly, basic civil liberties guaranteed by the former and fortified by the latter amendment. The First provides, " Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances " and the Fourteenth, which makes it applicable to the States, " All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law, which shall abridge the privileges or immunities of citizens of

the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.''

The Supreme Court of the United States and other Federal and State courts have in recent years considered several city ordinances, departmental regulations and statutes alleged to be in contravention of these amendments. During the past decade the judicial trend has been away from strict regulation of these freedoms and toward a loosening of the barriers to their fullest exercise. A cursory review of the leading cases impels the conclusion arrived at by this court.

In *Commonwealth* v. *Abrahams* (156 Mass. 57 [1892]) the defendant was fined for making a public address in a city park, in violation of the rules of the Park Commissioners. LATHROP, J., delivering the opinion for the Supreme Court, which included the late Justice OLIVER WENDELL HOLMES, in affirming the conviction, said (p. 60): '' The defendant admits that the people would not have the right to assemble for the purposes specified in the public streets, and that they might not have such right in the Public Garden or on the Common, because such an assembly would or might be inconsistent with the public uses for which these places are held. The same reasons apply to any particular park. The parks of Boston are designed for the use of the public generally, and whether any park or a part of any park can be temporarily set aside for the use of a portion of the public is for the park commissioners to decide, in the exercise of their discretion.''

*Davis* v. *Massachusetts* (167 U. S. 43 [1897]) involved the following ordinance of the City of Boston: '' Sec. 66. No person shall, in or upon any of the public grounds, make any public address, discharge any cannon or firearm, expose for sale any goods, wares or merchandise, erect or maintain any booth, stand, tent or apparatus for the purposes of public amusement or show, except in accordance with a permit from the mayor.''

Delivering the opinion of the court, WHITE, J., said (pp. 47–48): '' There is no evidence before us to show that the power of the legislature over the common is less than its power over any other park dedicated to the use of the public or over public streets the legal title to which is in a city or town. *Lincoln* v. *Boston,* 148 Mass. 578, 580. As representative of the public it may and does exercise control over the use which the public may make of such places, and it may and does delegate more or less of such control to the city or town immediately con-

cerned. For the legislature absolutely or conditionally to forbid public speaking in a highway or public park is no more an infringement of the rights of a member of the public than for the owner of a private house to forbid it in his house. When no proprietary right interferes the legislature may end the right of the public to enter upon the public place by putting an end to the dedication to public uses. So it may take the less step of limiting the public use to certain purposes. See Dillon Mun. Corp. secs. 393, 407, 651, 656, 666; *Brooklyn Park Commissioners* v. *Armstrong,* 45 N. Y. 234, 243, 244.

" If the legislature had power under the constitution to pass a law in the form of the present ordinance, there is no doubt that it could authorize the city of Boston to pass the ordinance, and it is settled by the former decision, *Commonwealth* v. *Davis,* 140 Mass. 485, that it has done so.

" It is, therefore, conclusively determined there was no right in the plaintiff in error to use the common except in such mode and subject to such regulations as the legislature in its wisdom may have deemed proper to prescribe. The Fourteenth Amendment to the Constitution of the United States does not destroy the power of the States to enact police regulations as to the subjects within their control, *Barbier* v. *Connolly,* 113 U. S. 27, 31; *Minneapolis & St. Louis Railway Co.* v. *Beckwith,* 129 U. S. 26, 29; *Giozza* v. *Tiernan,* 148 U. S. 657; *Jones* v. *Brim,* 165 U. S. 180, 182, and does not have the effect of creating a particular and personal right in the citizen to use public property in defiance of the constitution and laws of the State."

In *Love* v. *Judge of Recorder's Court* (128 Mich. 545 [1901]) the Supreme Court of that State, scanned the following ordinance of the City of Detroit:

" No person shall, in or upon any of the public streets, avenues, parks, grounds, or other public places within the one-half mile circle from the city hall, make any public address, beat drums, blow horns, or expose for sale any goods, wares, or merchandise, erect or maintain any booth, stand, tent, or apparatus, except in accordance with a permit from the mayor * * *."

In interpretation thereof, the court said (pp. 547–549): " It is conceded that the Campus Martius is an open paved space nearly front of the city hall, where many of the principal streets of the city join each other. A portion of it is occupied by the soldier's monument, and nearly all of the street-car lines in the city pass upon one or the other of its borders. * * * The question in this case is, Who may occupy the public places in the city, some individual who happens to get there first, or shall

all the citizens of Detroit have equal rights there? and what shall be the manner of the occupancy? It is evident that no considerable portion of the citizens of a great city like Detroit could occupy this limited space at one time; nor could all of the preachers, teachers and public speakers in that city who might think they had a message to deliver to the people, with the audiences they would naturally draw, find room at the one time in this public space, without rendering it useless as a place across which the public might travel. Under such circumstances, what can be more reasonable than to lodge the power of deciding when and where one may occupy this public space in one having sufficient intelligence and so possessing the confidence of his fellow citizens that they have placed him at the head of the municipal government? * * *. It is said the ordinance is directed against freedom of speech; but this is a mistake. It is simply directed to the method of using a public space, and is no more a curtailment of the right of free speech than would be an ordinance that prohibited the making of public addresses in the corridors of the city hall."

In *Coughlin* v. *Chicago Park District* (364 Ill. 90 [1936]) the Supreme Court of Illinois upheld the refusal of the local authorities to grant a permit to Reverend Charles E. Coughlin to make a public address in Soldier's Field, a public park, on behalf of the National Union for Social Justice. Succinctly the court stated (p. 107): " * * * no citizen has a right to use at his pleasure or on his own terms, public property belonging to and under the control of a municipality, without a permit * * *."

*Hague* v. *C. I. O.* (307 U. S. 496), decided June 5, 1939, is a judicial refurbishment of the armor of civil liberties. The ordinance under review, in part, recited: " The Board of Commissioners of Jersey City Do Ordain:

" 1. From and after the passage of this ordinance, no public parades or public assembly in or upon the public streets, highways, public parks or public buildings of Jersey City shall take place or be conducted until a permit shall be obtained from the Director of Public Safety.

" 2. The Director of Public Safety is hereby authorized and empowered to grant permits for parades and public assembly, upon application made to him at least three days prior to the proposed parade or public assembly.

" 3. The Director of Public Safety is hereby authorized to refuse to issue said permit when, after investigation of all of the facts and circumstances pertinent to said application, he believes it to be proper to refuse the issuance thereof; provided,

however, that said permit shall only be refused for the purpose of preventing riots, disturbances or disorderly assemblage.''

It compared the ordinance *sub judice* with that in the *Davis* case (167 U. S. 43, *supra*) and said (pp. 515–516): '' The ordinance there in question apparently had a different purpose from that of the one here challenged, for it was not directed solely at the exercise of the right of speech and assembly, but was addressed as well to other activities, not in the nature of civil rights, which doubtless might be regulated or prohibited as respects their enjoyment in parks. In the instant case the ordinance deals only with the exercise of the right of assembly for the purpose of communicating views entertained by speakers, and is not a general measure to promote the public convenience in the use of the streets or parks.

'' We have no occasion to determine whether on the facts disclosed, the *Davis* case was rightly decided, but we cannot agree that it rules the instant case. Wherever the title of streets and parks may rest, they have immemorially been in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions. Such use of the streets and public places has, from ancient times, been a part of the privileges, immunities, rights, and liberties of citizens. *The privilege of a citizen of the United States to use the streets and parks for communication of views on national questions may be regulated in the interest of all; it is not absolute, but relative, and must be exercised in subordination to the general comfort and convenience, and in consonance with peace and good order; but it must not, in the guise of regulation, be abridged or denied.*

'' We think the court below was right in holding the ordinance quoted in Note 1 void upon its face. It does not make comfort and convenience in the use of the streets or parks the standard of official action. It enables the Director of Safety to refuse a permit on his mere opinion that such refusal will prevent ' riots, disturbances or disorderly assemblage.' It can thus, as the record discloses, be made the instrument of arbitrary suppression * * * of views on national affairs, for the prohibition of all speaking will undoubtedly ' prevent ' such eventualities. But the uncontrolled official suppression of the privilege cannot be made a substitute for the duty to maintain order in connection with the exercise of the right.'' (Italics ours.)

*Schneider* v. *State* (308 U. S. 147 [1939]) concerned an ordinance forbidding canvassing, soliciting, or distributing circulars without a permit. Ignoring the regulation, a solicitor for

the Watch Tower Bible and Tract Society canvassed the public. The court held the ordinance unconstitutional because it banned freedom of opinion. Nonetheless, the court stated (p. 160): " For example, a person could not exercise this liberty by taking his stand in the middle of a crowded street, contrary to traffic regulations, and maintain his position to the stoppage of all traffic   *   *   *."

*Lovell* v. *Griffin* (303 U. S. 444 [1938]) involved an ordinance prohibiting the distribution of circulars and other literature without permit. In reversing the conviction of a person, who, in defiance thereof, distributed religious tracts of a sect known as " Kingdom of Jehovah ", in the State of Georgia, the court, by Chief Justice HUGHES, held the ordinance void as in conflict with said constitutional amendments.

In *Board of Education* v. *Barnette* (319 U. S. 624 [1943]), the State Board of Education, exercising statutory authority, made it compulsory for children in the public schools to salute the flag and to pledge allegiance. Members of a sect known as " Jehovah's Witnesses " sought an injunction to prevent the enforcement of the regulation, alleging that its sectaries were being expelled from the public schools, and parents, persecuted. Their religious beliefs include a literal version of Exodus, chapter 20, verses 4 and 5: " Thou shalt not make unto thee any graven image, or any likeness of any thing that is in heaven above, or that is in the earth beneath, or that is in the water under the earth; Thou shalt not bow down thyself to them, nor serve them   *   *   *."

The court found that members of this faith consider that our flag is an "image " within this command and for that reason refuse to salute it and held that the regulation violated the First Amendment, saying (pp. 634–635): " *   *   *   many citizens who do not share these religious views hold such a compulsory rite to infringe the constitutional liberty of the individual." Judge JACKSON opined (p. 641): " There is no mysticism in the American concept of the State or of the nature of origin of its authority. We set up government by consent of the governed, and the Bill of Rights denies those in power any legal opportunity to coerce that consent. Authority here is to be controlled by public opinion, not public opinion by authority."

In *Thomas* v. *Collins* (323 U. S. 516 [1945]) was assailed a Texas statute, requiring labor organizers before they solicited members, to file a request with the Secretary of State for an organizer's card. Thomas, then president of the United Automobile Workers, in disregard of the statute, made a speech,

soliciting membership. The statute was rejected as unconstitutional. For the court, RUTLEDGE, J., said (p. 530): "Accordingly, whatever occasion would restrain orderly discussion and persuasion, at an appropriate time and place, must have clear support in public danger, actual or impending." And referring (p. 538) to *Schneider* v. *State, Lovell* v. *Griffin, Hague* v. *C. I. O.* (*supra*) and similar cases, stated: "In these cases, however, the license requirements were for more than mere identification or previous registration and were held invalid because they vested discretion in the issuing authorities to censor the activity involved."

It should be noted that unlike the ordinances, regulations and statutes above appraised, the park regulation in the main case does not deal exclusively with the rights of freedom of press, speech or assembly, but embraces more than a score of activities, vests no discretion in the administrative officer issuing the permit and confers upon him no power of censorship. It should also be noted that it is the policy of the authorities of the city of New York to allocate space at certain public parks for free assembly and free speech without the prerequisite of official permit. In the borough of Manhattan, such spaces are Union Square Park, North Plaza, Madison Square Park, East Sidewalk, Washington Square Park, East Side, and Dorrence Brook Square in Harlem.

Defendants place chief reliance on the case of *People* v. *Ribinovich* (171 Misc. 569), decided June 16, 1939, by the Appellate Part of the Court of Special Sessions of this city, second judicial department, which reversed a conviction based on the violation of the regulation now questioned. There, members of a labor union carrying placards, with the words " This job unfair " to labor, picketed a store on the Coney Island Boardwalk. The Appellate Court posed the issue, " May a labor union picket a private business, located on the Coney Island Boardwalk without first obtaining a permit from the department of parks? ", and held that no statute or regulation, no matter how worthy its intendment, should be interpreted in such a way as to interfere with the fundamental right peacefully to picket, because that right was as important as those of free speech and free assembly. The opinion in passing cites *Perrin* v. *N. Y. Central R. R. Co.* (36 N. Y. 120) with its definition that (p. 570), " A park is a pleasure ground set apart for recreation of the public to promote its health and enjoyment ", continues (pp. 570–571), " The instant case, however, presents a situation which raises other problems. Abutting upon the boardwalk at

Coney Island are a number of private businesses. The entire section to the west of the boardwalk is commercialized. * * * they are concededly operated for private gain and profit by private individuals. * * * I do not believe that it was intended by the regulation in question to grant to private businesses operating on city property an immunity from the consequences of labor disputes which other private businesses do not possess ", and concludes (p. 572), " I am constrained to hold upon the facts of this case that the regulation did not intend to prevent peaceful picketing of private businesses in the course of a labor dispute."

From the foregoing statement of the facts of this case, it appears that the decision is *sui generis*. The locus of the controversy was not a park as defined in *Perrin* v. *N. Y. Central R. R. Co. (supra)* nor by the same court in *Williams* v. *Gallatin* (229 N. Y. 248).

By what legalistic legerdemain does a boardwalk lined with retail shops, amusement arcades, beverage booths, etc., become a park within the definition of the Court of Appeals? Only the fantasy of " Alice in Wonderland." can convert a highway ribboned with asphalt into verdant acreage. Coney Island hot dog stands and peep shows are not maple trees and evergreens.

Efficient administration brought the boardwalk under the jurisdiction of the Park Department, likewise, zoos, municipal pools and paved playgrounds. Because they are so regulated does that make them leafy shaded lawns? In the *Ribinovich* case (supra), the court, under the compulsion of industrial necessity, treated the boardwalk as a business thoroughfare. The case before us does not concern such a highway. Here we are dealing with the City Hall Park, an oasis of classical charm and refreshment of the spirit. Surrounded by the brick and marble of the metropolis it has been " set apart for recreation of the public to promote its health and enjoyment."

If section 21 of the Park Regulation is to be nullified, who is to arrange for its orderly use? Not to disarrange its peaceful pattern, the Park Commissioner has been given ministerial authority to prevent, without his permit, any person from erecting a stand, holding a meeting, conducting a dramatic performance, etc., within the park. If the *Ribinovich* case (supra) is to apply to these delimited activities, then this restful haven will become a bedlam, tenanted by pedlars of panaceas and economic evangelists. The lunatic fringe whose tub-thumping makes a nightmare of Columbus Circle, will drag their soapbox rostrums in the daytime to this newly created Elysium. Fascist,

Communist, Atheist, Christian Mobilizer, Physical Culturist and Salvation Salesman, not forgetting the motley tribe of congenital uprooters and lantern-jawed mongers of hate, will confound the peaceful burghers of Manhattan. How stop a troupe of players from performing a drama of social significance, without enucleating this revised Bill of Rights? Will the banning of ballets, symbolic of tendentious economic trends, discredit this new version of constitutional guarantees? Are broken skulls to be the sequel to the clashing of proselyting antagonisms?

If these thirteen placarders cannot be shooed from the steps of City Hall, why not from its corridors? Consistently why bar the insigne and slogans of thirteen-hundred crusaders of like ilk?

The Bill of Rights is the very stuff of American folkways. Only yesterday in the Old World, demagogues, inflated by the heady brew of totalitarianism, emasculated its substance. Is there any doubt that their recent suppression of freedom of thought, conscience and expression was the prelude to mankind's most catastrophic tragedy? There is a time and place for all things. Why except the orderly regulation of civil liberties from the virtues of homely wisdom? Was City Hall Park, during the Churchill reception, a quasi-State function, the time and place for ignoring such regulation? There is no quarrel with the placarded protestations of these defendants. Their sentiments mirrored a large segment of public opinion. Masses of our citizens repudiate Churchill's pontifical criteria of social, political and economic systems, as antediluvian as the armadillo. Counsel for the defendants urge " that these young men went to the reception because they felt that the man Churchill, in his speeches was advocating a third world war ". Does not that lamentation repeat a theme that a few years back was constantly on the tongues of identifiable militant groups? When in the nineteen-thirties, Germany and Russia welded by treaty, were ravishing Poland and igniting the second World War, did not these same articulate echelons chant, " The Yanks are not going over there."? Who was it that castigated the President of the United States as an imperialistic warmonger? Over night, when that marriage of European political convenience went on the rocks and the talons of the Prussian Vulture were sunk in the vitals of the Russian Bear, who clamored most vociferously for a crusade against the Nazi Genghis Khan?

The testimony in this case is that these defendants served in our armed forces. What local apostle of the Soviet testament bent their zeal for economic democracy in our time, to the ends

of Russian Weltpolitik? Elsewhere too, kindred searchers for a brave new world have been forged into tools for strengthening Russia's monolithic imperialism. The Soviet domain spreads over two continents from the Baltic to the Pacific, and is moving with glacial inevitability from the Arctic Seas to the warm waters of the Mediterranean and the Persian Gulf. In our own Colonial times, the Czars held not only Alaska but immense beachheads along our western continental shore. Czaristic fortresses picketed the California Coast. From the time of Peter the Great to that of Stalin of the Soviets, territorial aggrandizement — not a proletarian Utopia — has been the goal of Muscovy. Its domestic police policy remains unchanged — blind obedience to the current oligarchy of the ironfisted few. No citizen, steeped in our folkways, will discard the vestments of liberty for a strait jacket, tailored in the ideological shop of any latter-day economic Messiah. Not for him the medicine men of Moscow or Madrid, nor the broken idols of Rome or Tokyo.

These defendants should not suffer themselves to be manipulated by ideologues, who seek to use our Bill of Rights as a weapon for the atomization of democratic institutions. Any American who sought to shield himself with civil liberties in a totalitarian land would rot in a concentration camp or be silenced in a crematorium.

The jurist is not a recluse in an ivory tower. His senses are alive to the sounds and smells of the marketplace. From the quarries of the common folk, are hewn the building blocks of jurisprudence. The judicial process should not be enmeshed in the finespun but futile abstractions of medieval scholasticism. Greek philosophy bespoke " Moderation in all things ". It is not amiss to be guided by its wisdom in the scrutiny of the Bill of Rights and of the regulation under attack in this proceeding.

The motion to dismiss the complaint is denied.