# COX *v*. LOUISIANA.

No. 24.   Argued October 21, 1964.—Decided January 18, 1965.

*Carl. Rachlin* argued the cause for appellant. With him on the brief were *Robert Collins, Nils Douglas* and *Floyd McKissick.*

*Ralph L. Roy* argued the cause for appellee. With him on the brief was *Jack P. F. Gremillion,* Attorney General of Louisiana.

MR. JUSTICE GOLDBERG delivered the opinion of the Court.

Appellant, the Reverend Mr. B. Elton Cox, the leader of a civil rights demonstration, was arrested and charged

with four offenses under Louisiana law—criminal conspiracy, disturbing the peace, obstructing public passages, and picketing before a courthouse. In a consolidated trial before a judge without a jury, and on the same set of facts, he was acquitted of criminal conspiracy but convicted of the other three offenses. He was sentenced to serve four months in jail and pay a $200 fine for disturbing the peace, to serve five months in jail and pay a $500 fine for obstructing public passages, and to serve one year in jail and pay a $5,000 fine for picketing before a courthouse. The sentences were cumulative.

In accordance with Louisiana procedure, the Louisiana Supreme Court reviewed the "disturbing the peace" and "obstructing public passages" convictions on certiorari, and the "courthouse picketing" conviction on appeal. The Louisiana court, in two judgments, affirmed all three convictions. 244 La. 1087, 156 So. 2d 448; 245 La. 303, 158 So. 2d 172. Appellant filed two separate appeals to this Court from these judgments contending that the three statutes under which he was convicted were unconstitutional on their face and as applied. We noted probable jurisdiction of both appeals, 377 U. S. 921. This case, No. 24, involves the convictions for disturbing the peace and obstructing public passages, and No. 49 concerns the conviction for picketing before a courthouse.

I.

THE FACTS.

On December 14, 1961, 23 students from Southern University, a Negro college, were arrested in downtown Baton Rouge, Louisiana, for picketing stores that maintained segregated lunch counters. This picketing, urging a boycott of those stores, was part of a general protest movement against racial segregation, directed by the local chapter of the Congress of Racial Equality, a civil rights

organization. The appellant, an ordained Congregational minister, the Reverend Mr. B. Elton Cox, a Field Secretary of CORE, was an advisor to this movement. On the evening of December 14, appellant and Ronnie Moore, student president of the local CORE chapter, spoke at a mass meeting at the college. The students resolved to demonstrate the next day in front of the courthouse in protest of segregation and the arrest and imprisonment of the picketers who were being held in the parish jail located on the upper floor of the courthouse building.

The next morning about 2,000 students left the campus, which was located approximately five miles from downtown Baton Rouge. Most of them had to walk into the city since the drivers of their busses were arrested. Moore was also arrested at the entrance to the campus while parked in a car equipped with a loudspeaker, and charged with violation of an antinoise statute. Because Moore was immediately taken off to jail and the vice president of the CORE chapter was already in jail for picketing, Cox felt it his duty to take over the demonstration and see that it was carried out as planned. He quickly drove to the city "to pick up this leadership and keep things orderly."

When Cox arrived, 1,500 of the 2,000 students were assembling at the site of the old State Capitol building, two and one-half blocks from the courthouse. Cox walked up and down cautioning the students to keep to one side of the sidewalk while getting ready for their march to the courthouse. The students circled the block in a file two or three abreast occupying about half of the sidewalk. The police had learned of the proposed demonstration the night before from news media and other sources. Captain Font of the City Police Department and Chief Kling of the Sheriff's office, two high-ranking subordinate officials, approached the group and spoke to Cox at the northeast corner of the capitol

grounds. Cox identified himself as the group's leader, and, according to Font and Kling, he explained that the students were demonstrating to protest "the illegal arrest of some of their people who were being held in jail." The version of Cox and his witnesses throughout was that they came not "to protest just the arrest but . . . [also] to protest the evil of discrimination." Kling asked Cox to disband the group and "take them back from whence they came." Cox did not acquiesce in this request but told the officers that they would march by the courthouse, say prayers, sing hymns, and conduct a peaceful program of protest. The officer repeated his request to disband, and Cox again refused. Kling and Font then returned to their car in order to report by radio to the Sheriff and Chief of Police who were in the immediate vicinity; while this was going on, the students, led by Cox, began their walk toward the courthouse.

They walked in an orderly and peaceful file, two or three abreast, one block east, stopping on the way for a red traffic light. In the center of this block they were joined by another group of students. The augmented group now totaling about 2,000 [1] turned the corner and proceeded south, coming to a halt in the next block opposite the courthouse.

As Cox, still at the head of the group, approached the vicinity of the courthouse, he was stopped by Captain Font and Inspector Trigg and brought to Police Chief Wingate White, who was standing in the middle of St. Louis Street. The Chief then inquired as to the purpose of the demonstration. Cox, reading from a prepared paper, outlined his program to White, stating that it would include a singing of the Star Spangled Banner

---

[1] Estimates of the crowd's size varied from 1,500 to 3,800. Two thousand seems to have been the consensus and was the figure accepted by the Louisiana Supreme Court, 244 La., at 1095, 156 So. 2d, at 451.

and a "freedom song," recitation of the Lord's Prayer and the Pledge of Allegiance, and a short speech. White testified that he told Cox that "he must confine" the demonstration "to the west side of the street." White added, "This, of course, was not—I didn't mean it in the import that I was giving him any permission to do it, but I was presented with a situation that was accomplished, and I had to make a decision." Cox testified that the officials agreed to permit the meeting. James Erwin, news director of radio station WIBR, a witness for the State, was present and overheard the conversation. He testified that "My understanding was that they would be allowed to demonstrate if they stayed on the west side of the street and stayed within the recognized time," [2] and that this was "agreed to" by White.[3]

The students were then directed by Cox to the west sidewalk, across the street from the courthouse, 101 feet from its steps. They were lined up on this sidewalk about five deep and spread almost the entire length of the block. The group did not obstruct the street. It was close to noon and, being lunch time, a small crowd of 100 to 300 curious white people, mostly courthouse personnel, gathered on the east sidewalk and courthouse steps, about 100 feet from the demonstrators. Seventy-five to eighty policemen, including city and state patrolmen and members of the Sheriff's staff, as well as members of the fire department and a fire truck were stationed in the street between the two groups. Rain fell throughout the demonstration.

---

[2] There were varying versions in the record as to the time the demonstration would take. The State's version was that Cox asked for seven minutes. Cox's version was that he said his speech would take seven minutes but that the whole program would take between 17 and 25 minutes.

[3] The "permission" granted the students to demonstrate is discussed at greater length in No. 49, where its legal effect is considered.

Several of the students took from beneath their coats picket signs similar to those which had been used the day before. These signs bore legends such as "Don't buy discrimination for Christmas," "Sacrifice for Christ, don't buy," and named stores which were proclaimed "unfair." They then sang "God Bless America," pledged allegiance to the flag, prayed briefly, and sang one or two hymns, including "We Shall Overcome." The 23 students, who were locked in jail cells in the courthouse building out of the sight of the demonstrators, responded by themselves singing; this in turn was greeted with cheers and applause by the demonstrators. Appellant gave a speech, described by a State's witness as follows:

"He said that in effect that it was a protest against the illegal arrest of some of their members and that other people were allowed to picket . . . and he said that they were not going to commit any violence,[4] that if anyone spit on them, they would not spit back on the person that did it." [5]

Cox then said:

"All right. It's lunch time. Let's go eat. There are twelve stores we are protesting. A number of these stores have twenty counters; they accept your money from nineteen. They won't accept it from the

---

[4] A few days before, Cox had participated with some of the demonstrators in a "direct non-violent clinic" sponsored by CORE and held at St. Mark's Church.

[5] Sheriff Clemmons had no objection to this part of the speech. He testified on cross-examination as follows:

"Q. Did you have any objection to that part of his talk?

"A. None whatever. If he would have done what he said, there would have been no trouble at all. The whole thing would have been over and done with.

"Q. Did you have any objection to them being assembled on that side of the street while he was making that speech, sir?

"A. I had no objection to it."

twentieth counter. This is an act of racial discrimination. These stores are open to the public. You are members of the public. We pay taxes to the Federal Government and you who live here pay taxes to the State." [6]

In apparent reaction to these last remarks, there was what state witnesses described as "muttering" and "grumbling" by the white onlookers.[7]

The Sheriff, deeming, as he testified, Cox's appeal to the students to sit in at the lunch counters to be "inflammatory," then took a power microphone and said, "Now, you have been allowed to demonstrate. Up until now your demonstration has been more or less peaceful, but what you are doing now is a direct violation of the law, a disturbance of the peace, and it has got to be broken up immediately." The testimony as to what then happened is disputed. Some of the State's witnesses testified that Cox said, "don't move"; others stated that he made a "gesture of defiance." It is clear from the record, however, that Cox and the demonstrators did not then and there break up the demonstration. Two of the Sheriff's deputies immediately started across the street and told the group, "You have heard what the Sheriff said, now, do what he said." A state witness testified that they

---

[6] Sheriff Clemmons objected strongly to these words. He testified on cross-examination as follows:

"Q. Now, what part of his speech became objectionable to him being assembled there?

"A. The inflammatory manner in which he addressed that crowd and told them to go on up town, go to four places on the protest list, sit down and if they don't feed you, sit there for one hour."

[7] The exact sequence of these events is unclear from the record, being described differently not only by the State and the defense, but also by the state witnesses themselves. It seems reasonably certain, however, that the response to the singing from the jail, the end of Cox's speech, and the "muttering" and "grumbling" of the white onlookers all took place at approximately the same time.

put their hands on the shoulders of some of the students "as though to shove them away."

Almost immediately thereafter—within a time estimated variously at two to five minutes—one of the policemen exploded a tear gas shell at the crowd. This was followed by several other shells. The demonstrators quickly dispersed, running back towards the State Capitol and the downtown area; Cox tried to calm them as they ran and was himself one of the last to leave.

No Negroes participating in the demonstration were arrested on that day. The only person then arrested was a young white man, not a part of the demonstration, who was arrested "because he was causing a disturbance." The next day appellant was arrested and charged with the four offenses above described.

## II.

### THE BREACH OF THE PEACE CONVICTION.

Appellant was convicted of violating a Louisiana "disturbing the peace" statute, which provides:

> "Whoever with intent to provoke a breach of the peace, or under circumstances such that a breach of the peace may be occasioned thereby . . . crowds or congregates with others . . . in or upon . . . a public street or public highway, or upon a public sidewalk, or any other public place or building . . . and who fails or refuses to disperse and move on . . . . when ordered so to do by any law enforcement officer of any municipality, or parish, in which such act or acts are committed, or by any law enforcement officer of the state of Louisiana, or any other authorized person . . . shall be guilty of disturbing the peace."

La. Rev. Stat. § 14:103.1 (Cum. Supp. 1962).

It is clear to us that on the facts of this case, which are strikingly similar to those present in *Edwards* v. *South*

*Carolina,* 372 U. S. 229, and *Fields* v. *South Carolina,* 375 U. S. 44, Louisiana infringed appellant's rights of free speech and free assembly by convicting him under this statute. As in *Edwards,* we do not find it necessary to pass upon appellant's contention that there was a complete absence of evidence so that his conviction deprived him of liberty without due process of law. Cf. *Thompson* v. *Louisville,* 362 U. S. 199. We hold that Louisiana may not constitutionally punish appellant under this statute for engaging in the type of conduct which this record reveals, and also that the statute as authoritatively interpreted by the Louisiana Supreme Court is unconstitutionally broad in scope.

The Louisiana courts have held that appellant's conduct constituted a breach of the peace under state law, and, as in *Edwards,* "we may accept their decision as binding upon us to that extent," *Edwards* v. *South Carolina, supra,* at 235; but our independent examination of the record, which we are required to make,[8] shows no conduct which the State had a right to prohibit as a breach of the peace.

Appellant led a group of young college students who wished "to protest segregation" and discrimination against Negroes and the arrest of 23 fellow students. They assembled peaceably at the State Capitol building

_____

[8] Because a claim of constitutionally protected right is involved, it "remains our duty in a case such as this to make an independent examination of the whole record." *Edwards* v. *South Carolina,* 372 U. S. 229, 235; *Blackburn* v. *Alabama,* 361 U. S. 199, 205, n. 5; *Pennekamp* v. *Florida,* 328 U. S. 331, 335; *Fiske* v. *Kansas,* 274 U. S. 380, 385-386. In the area of First Amendment freedoms as well as areas involving other constitutionally protected rights, "we cannot avoid our responsibilities by permitting ourselves to be 'completely bound by state court determination of any issue essential to decision of a claim of federal right, else federal law could be frustrated by distorted fact finding.'" *Haynes* v. *Washington,* 373 U. S. 503, 515-516; *Stein* v. *New York,* 346 U. S. 156, 181.

and marched to the courthouse where they sang, prayed and listened to a speech. A reading of the record reveals agreement on the part of the State's witnesses that Cox had the demonstration "very well controlled," and until the end of Cox's speech, the group was perfectly "orderly." Sheriff Clemmons testified that the crowd's activities were not "objectionable" before that time. They became objectionable, according to the Sheriff himself, when Cox, concluding his speech, urged the students to go uptown and sit in at lunch counters. The Sheriff testified that the sole aspect of the program to which he objected was "[t]he inflammatory manner in which he [Cox] addressed that crowd and told them to go on up town, go to four places on the protest list, sit down and if they don't feed you, sit there for one hour." Yet this part of Cox's speech obviously did not deprive the demonstration of its protected character under the Constitution as free speech and assembly. See *Edwards* v. *South Carolina, supra; Cantwell* v. *Connecticut,* 310 U. S. 296; *Thornhill* v. *Alabama,* 310 U. S. 88; *Garner* v. *Louisiana,* 368 U. S. 157, 185 (concurring opinion of MR. JUSTICE HARLAN).

The State argues, however, that while the demonstrators started out to be orderly, the loud cheering and clapping by the students in response to the singing from the jail converted the peaceful assembly into a riotous one.[9] The record, however, does not support this assertion. It is true that the students, in response to the sing-

---

[9] The cheering and shouting were described differently by different witnesses, but the most extravagant descriptions were the following: "a jumbled roar like people cheering at a football game," "loud cheering and spontaneous clapping and screaming and a great hullabaloo," "a great outburst," a cheer of "conquest . . . much wilder than a football game," "a loud reaction, not disorderly, loud," "a shout, a roar," and an emotional response "in jubilation and exhortation." Appellant agreed that some of the group "became emotional" and "tears flowed from young ladies' eyes."

ing of their fellows who were in custody, cheered and applauded. However, the meeting was an outdoor meeting and a key state witness testified that while the singing was loud, it was not disorderly. There is, moreover, no indication that the mood of the students was ever hostile, aggressive, or unfriendly. Our conclusion that the entire meeting from the beginning until its dispersal by tear gas was orderly [10] and not riotous is confirmed by a film of the events taken by a television news photographer, which was offered in evidence as a state exhibit. We have viewed the film, and it reveals that the students, though they undoubtedly cheered and clapped, were well-behaved throughout. My Brother BLACK, concurring in this opinion and dissenting in No. 49, *post*, agrees "that

---

[10] There is much testimony that the demonstrators were well controlled and basically orderly throughout. G. Dupre Litton, an attorney and witness for the State, testified, "I would say that it was an orderly demonstration. It was too large a group, in my opinion, to congregate at that place at that particular time, which is nothing but my opinion . . . but generally . . . it was orderly." Robert Durham, a news photographer for WBRZ, a state witness, testified that although the demonstration was not "quiet and peaceful," it was basically "orderly." James Erwin, news director of WIBR, a witness for the State, testified as follows:

"Q. Was the demonstration generally orderly?

"A. Yes, Reverend Cox had it very well controlled."

On the other hand, there is some evidence to the contrary: Erwin also stated:

"Q. Was it orderly up to the point of throwing the tear gas?

"A. No, there was one minor outburst after he called for the sit-ins, and then a minor reaction, and then a loud reaction, not disorderly, loud . . . . A loud reaction when the singing occurred upstairs."

And James Dumigan, a police officer, thought that the demonstrators showed a certain disorder by "hollering loud, clapping their hands." But this latter evidence is surely not sufficient, particularly in face of the film, to lead us to conclude that the cheering was so disorderly as to be beyond that held constitutionally protected in *Edwards* v. *South Carolina, supra.*

the record does not show boisterous or violent conduct or indecent language on the part of the . . ." students. *Post*, at 583. The singing and cheering do not seem to us to differ significantly from the constitutionally protected activity of the demonstrators in *Edwards*,[11] who loudly sang "while stamping their feet and clapping their hands." *Edwards v. South Carolina, supra,* at 233.[12]

---

[11] Moreover, there are not significantly more demonstrators here than in *Fields* v. *South Carolina, supra,* which involved more than 1,000 students.

[12] Witnesses who concluded that a breach of the peace was threatened or had occurred based their conclusions, not upon the shouting or cheering, but upon the fact that the group was demonstrating at all, upon Cox's suggestion that the group sit in, or upon the reaction of the white onlookers across the street. Rush Biossat, a state witness, testified that while appellant "didn't say anything of a violent nature," there was "emotional upset," "a feeling of disturbance in the air," and "agitation"; he thought, however, that all this was caused by Cox's remarks about "black and white together." James Erwin, a state witness, and news director of WIBR, testified that there was "considerable stirring" and a "restiveness," but among the white group. He also stated that the reaction of the white group to Cox's speech "was electrifying." "You could hear grumbling from the small groups of white people, some total of two hundred fifty, perhaps . . . and there was a definite feeling of ill will that had sprung up." He was afraid that "violence was about to erupt" but also thought that Cox had his group under control and did not want violence. G. L. Johnston, a police officer and a witness for the State, felt that the disorderly part of the demonstration was Cox's suggestion that the group sit in. Vay Carpenter, and Mary O'Brien, legal secretaries and witnesses for the State, thought that the mood of the crowd changed at the time of Cox's speech and became "tense." They thought this was because of the sit-in suggestion. Chief Kling of the Sheriff's office, testifying for the State, said that the situation became one "that was explosive and one that had gotten to the point where it had to be handled or it would have gotten out of hand"; however, he based his opinion upon "the mere presence of these people in downtown Baton Rouge . . . in such great numbers." Police Captain Font also testified for the State that the situation was "explosive"; he based this opinion on

Our conclusion that the record does not support the contention that the students' cheering, clapping and singing constituted a breach of the peace is confirmed by the fact that these were not relied on as a basis for conviction by the trial judge, who, rather, stated as his reason for convicting Cox of disturbing the peace that "[i]t must be

---

"how they came, such a large group like that, just coming out of nowhere, just coming, filling the streets, filling the sidewalks. We are prepared—we have traffic officers. We can handle traffic situations if we are advised that we are going to have a traffic situation, if the sidewalk is going to be blocked, if the street is going to be blocked, but we wasn't advised of it. They just came and blocked it." He added that he feared "bloodshed," but based this fear upon "when the Sheriff requested them to move, they didn't move; when they cheered in a conquest type of tone; their displaying of the signs; the deliberate agitation that twenty-five people had been arrested the day before, and then they turned right around and just agitated the next day in the same prescribed manner." He also felt that the students displayed their signs in a way which was "agitating." Inspector Trigg testified for the State that "from their actions, I figured they were going to try to storm the Courthouse and take over the jail and try to get the prisoners that they had come down here to protest." However, Trigg based his conclusions upon the students having marched down from the Capitol and paraded in front of the courthouse; he thought they were "violent" because "they continued to march around this Courthouse, and they continued to march down here and do things that disrupts our way of living down here." Sheriff Clemmons testified that the assembly "became objectionable" at the time of Cox's speech. The Sheriff objected to "the inflammatory manner in which he addressed that crowd and told them to go on up town, go to four places on the protest list, sit down and if they don't feed you, sit there for one hour. Prior to that, though, out from under these coats, some signs of—picketing signs. I don't know what's coming out of there next. It could be anything under a coat. It became inflammatory, and when he gestured, go on up town and take charge of these places . . . of business. That is what they were trying to do is take charge of this Courthouse."

A close reading of the record seems to reveal next to no evidence that anyone thought that the shouting and cheering were what constituted the threatened breach of the peace.

recognized to be inherently dangerous and a breach of the peace to bring 1,500 people, colored people, down in the predominantly white business district in the City of Baton Rouge and congregate across the street from the courthouse and sing songs as described to me by the defendant as the CORE national anthem carrying lines such as 'black and white together' and to urge those 1,500 people to descend upon our lunch counters and sit there until they are served. That has to be an inherent breach of the peace, and our statute 14:103.1 has made it so."

Finally, the State contends that the conviction should be sustained because of fear expressed by some of the state witnesses that "violence was about to erupt" because of the demonstration. It is virtually undisputed, however, that the students themselves were not violent and threatened no violence. The fear of violence seems to have been based upon the reaction of the group of white citizens looking on from across the street. One state witness testified that "he felt the situation was getting out of hand" as on the courthouse side of St. Louis Street "were small knots or groups of white citizens who were muttering words, who seemed a little bit agitated." A police officer stated that the reaction of the white crowd was not violent, but "was rumblings." Others felt the atmosphere became "tense" because of "mutterings," "grumbling," and "jeering" from the white group. There is no indication, however, that any member of the white group threatened violence. And this small crowd estimated at between 100 and 300 was separated from the students by "seventy-five to eighty" armed policemen, including "every available shift of the City Police," the "Sheriff's Office in full complement," and "additional help from the State Police," along with a "fire truck and the Fire Department." As Inspector Trigg testified, they could have handled the crowd.

This situation, like that in *Edwards,* is "a far cry from the situation in *Feiner* v. *New York,* 340 U. S. 315." See *Edwards* v. *South Carolina, supra,* at 236. Nor is there any evidence here of "fighting words." See *Chaplinsky* v. *New Hampshire,* 315 U. S. 568. Here again, as in *Edwards,* this evidence "showed no more than that the opinions which . . . [the students] were peaceably expressing were sufficiently opposed to the views of the majority of the community to attract a crowd and necessitate police protection." *Edwards* v. *South Carolina, supra,* at. 237. Conceding this was so, the "compelling answer . . . is that constitutional rights may not be denied simply because of hostility to their assertion or exercise." *Watson* v. *Memphis,* 373 U. S. 526, 535.

There is an additional reason why this conviction cannot be sustained. The statute at issue in this case, as authoritatively interpreted by the Louisiana Supreme Court, is unconstitutionally vague in its overly broad scope. The statutory crime consists of two elements: (1) congregating with others "with intent to provoke a breach of the peace, or under circumstances such that a breach of the peace may be occasioned," and (2) a refusal to move on after having been ordered to do so by a law enforcement officer. While the second part of this offense is narrow and specific, the first element is not. The Louisiana Supreme Court in this case defined the term "breach of the peace" as "to agitate, to arouse from a state of repose, to molest, to interrupt, to hinder, to disquiet." 244 La., at 1105, 156 So. 2d, at 455. In *Edwards,* defendants had been convicted of a common-law crime similarly defined by the South Carolina Supreme Court. Both definitions would allow persons to be punished merely for peacefully expressing unpopular views. Yet, a "function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with

conditions as they are, or even stirs people to anger. Speech is often provocative and challenging. It may strike at prejudices and preconceptions and have profound unsettling effects as it presses for acceptance of an idea. That is why freedom of speech . . . is . . . protected against censorship or punishment . . . . There is no room under our Constitution for a more restrictive view. For the alternative would lead to standardization of ideas either by legislatures, courts, or dominant political or community groups." *Terminiello* v. *Chicago,* 337 U. S. 1, 4–5. In *Terminiello* convictions were not allowed to stand because the trial judge charged that speech of the defendants could be punished as a breach of the peace " 'if it stirs the public to anger, invites dispute, brings about a condition of unrest, or creates a disturbance, or if it molests the inhabitants in the enjoyment of peace and quiet by arousing alarm.' " *Id.,* at 3. The Louisiana statute, as interpreted by the Louisiana court, is at least as likely to allow conviction for innocent speech as was the charge of the trial judge in *Terminiello.* Therefore, as in *Terminiello* and *Edwards* the conviction under this statute must be reversed as the statute is unconstitutional in that it sweeps within its broad scope activities that are constitutionally protected free speech and assembly. Maintenance of the opportunity for free political discussion is a basic tenet of our constitutional democracy. As Chief Justice Hughes stated in *Stromberg* v. *California,* 283 U. S. 359, 369: "A statute which upon its face, and as authoritatively construed, is so vague and indefinite as to permit the punishment of the fair use of this opportunity is repugnant to the guaranty of liberty contained in the Fourteenth Amendment."

For all these reasons we hold that appellant's freedoms of speech and assembly, secured to him by the First Amendment, as applied to the States by the Fourteenth Amendment, were denied by his conviction for disturbing the peace. The conviction on this charge cannot stand.

## III.

### THE OBSTRUCTING PUBLIC PASSAGES CONVICTION.

We now turn to the issue of the validity of appellant's conviction for violating the Louisiana statute, La. Rev. Stat. § 14:100.1 (Cum. Supp. 1962), which provides:

*"Obstructing Public Passages*

"No person shall wilfully obstruct the free, convenient and normal use of any public sidewalk, street, highway, bridge, alley, road, or other passageway, or the entrance, corridor or passage of any public building, structure, watercraft or ferry, by impeding, hindering, stifling, retarding or restraining traffic or passage thereon or therein.

"Providing however nothing herein contained shall apply to a bona fide legitimate labor organization or to any of its legal activities such as picketing, lawful assembly or concerted activity in the interest of its members for the purpose of accomplishing or securing more favorable wage standards, hours of employment and working conditions."

Appellant was convicted under this statute, not for leading the march to the vicinity of the courthouse, which the Louisiana Supreme Court stated to have been "orderly," 244 La., at 1096, 156 So. 2d, at 451, but for leading the meeting on the sidewalk across the street from the courthouse. *Id.,* at 1094, 1106–1107, 156 So. 2d, at 451, 455. In upholding appellant's conviction under this statute, the Louisiana Supreme Court thus construed the statute so as to apply to public assemblies which do not have as their specific purpose the obstruction of traffic. There is no doubt from the record in this case that this far sidewalk was obstructed, and thus, as so construed, appellant violated the statute.

Appellant, however, contends that as so construed and applied in this case, the statute is an unconstitutional

infringement on freedom of speech and assembly. This contention on the facts here presented raises an issue with which this Court has dealt in many decisions, that is, the right of a State or municipality to regulate the use of city streets and other facilities to assure the safety and convenience of the people in their use and the concomitant right of the people of free speech and assembly. See *Lovell* v. *Griffin*, 303 U. S. 444; *Hague* v. *CIO*, 307 U. S. 496; *Schneider* v. *State*, 308 U. S. 147; *Thornhill* v. *Alabama*, 310 U. S. 88; *Cantwell* v. *Connecticut*, 310 U. S. 296; *Cox* v. *New Hampshire*, 312 U. S. 569; *Largent* v. *Texas*, 318 U. S. 418; *Saia* v. *New York,* 334 U. S. 558; *Kovacs* v. *Cooper*, 336 U. S. 77; *Niemotko* v. *Maryland,* 340 U. S. 268; *Kunz* v. *New York*, 340 U. S. 290; *Poulos* v. *New Hampshire,* 345 U. S. 395.

From these decisions certain ·clear principles emerge. The rights of free speech and assembly, while fundamental in·our democratic society, still do not mean that everyone with opinions or beliefs to express may address a group at any public place and at any time. The constitutional guarantee of liberty implies the existence of an organized society maintaining public order, without which liberty itself would be lost in the excesses of anarchy. The control of travel on the streets is· a clear example of governmental responsibility to insure this necessary order. A restriction in that relation, designed to promote the public convenience in the interest of all, and not susceptible to abuses of discriminatory application, cannot be disregarded by the attempted exercise of some civil right which, in other circumstances, would be entitled to protection. One would not be justified in ignoring the familiar red light because this was thought to be a means of social protest. Nor could one, contrary to traffic regulations, insist upon a street meeting in the middle of Times Square at the rush hour as a form of freedom of speech or assembly. Governmental authorities have

the duty and responsibility to keep their streets open and available for movement. A group of demonstrators could not insist upon the right to cordon off a street, or entrance to a public or private building, and allow no one to pass who did not agree to listen to their exhortations. See *Lovell* v. *Griffin, supra,* at 451; *Cox* v. *New Hampshire, supra,* at 574; *Schneider* v. *State, supra,* at 160–161; *Cantwell* v. *Connecticut,* supra, at 306–307; *Giboney* v. *Empire Storage & Ice Co.,* 336 U. S. 490; *Poulos* v. *New Hampshire, supra,* at 405–408; see also, *Edwards* v. *South Carolina, supra,* at 236.

We emphatically reject the notion urged by appellant that the First and Fourteenth Amendments afford the same kind of freedom to those who would communicate ideas by conduct such as patrolling, marching, and picketing on streets and highways, as these amendments afford to those who communicate ideas by pure speech. See the discussion and cases cited in No. 49, *post,* at 563. We reaffirm the statement of the Court in *Giboney* v. *Empire Storage & Ice Co., supra,* at 502, that "it has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed."

We have no occasion in this case to consider the constitutionality of the uniform, consistent, and nondiscriminatory application of a statute forbidding all access to streets and other public facilities for parades and meetings.[13] Although the statute here involved on its face

---

[13] It has been argued that, in the exercise of its regulatory power over streets and other public facilities, a State or municipality could reserve the streets completely for traffic and other facilities for rest and relaxation of the citizenry. See *Kovacs* v. *Cooper, supra,* at 98 (opinion of Mr. Justice Jackson); *Kunz* v. *New York, supra,* at 298 (Mr. Justice Jackson, dissenting). The contrary, however, has been indicated, at least to the point that some open area must be preserved for outdoor assemblies. See *Hague* v. *CIO, supra,* at 515–516

precludes all street assemblies and parades,[14] it has not been so applied and enforced by the Baton Rouge authorities. City officials who testified for the State clearly indicated that certain meetings and parades are permitted in Baton Rouge, even though they have the effect of obstructing traffic, provided prior approval is obtained. This was confirmed in oral argument before this Court by counsel for the State. He stated that parades and meetings are permitted, based on "arrangements . . . made with officials." The statute itself provides no standards for the determination of local officials as to which assemblies to permit or which to prohibit. Nor are there any administrative regulations on this subject which have been called to our attention.[15] From all

(opinion of Mr. Justice Roberts); *Kunz* v. *New York, supra,* at 293; *Niemotko* v. *Maryland, supra,* at 283 (Mr. Justice Frankfurter, concurring). See generally, *Poulos* v. *New Hampshire, supra,* at 403; *Niemotko* v. *Maryland, supra,* at 272–273.

[14] With the express exception, of course, of labor picketing. This exception points up the fact that the statute reaches beyond mere traffic regulation to restrictions on expression.

[15] Although cited by neither party, research has disclosed the existence of a local ordinance of Baton Rouge, Baton Rouge City Code, Tit. 11, § 210 (1957), which prohibits "parade[s] . . . along any street except in accordance with a permit issued by the chief of police . . . ." A similar ordinance was in existence in *Fields* v. *South Carolina, supra.* As in *Fields,* this ordinance is irrelevant to the conviction in this case as not only was appellant not charged with its violation but the existence of the ordinance was never referred to by the State in any of the courts involved in the case, including this one, and neither the Louisiana trial court nor the Supreme Court relied on the ordinance in sustaining appellant's convictions under the three statutes here involved. Moreover, since the ordinance apparently sets forth no standards for the determination of the Chief of Police as to which parades to permit or which to prohibit, obvious constitutional problems would arise if appellant had been convicted for parading in violation of it. See the discussion in text above; *Lovell* v. *Griffin, supra,* at 452–453; *Hague* v. *CIO, supra,* at 518; *Saia* v. *New York, supra,* at 559–560.

the evidence before us it appears that the authorities in Baton Rouge permit or prohibit parades or street meetings in their completely uncontrolled discretion.

The situation is thus the same as if the statute itself expressly provided that there could only be peaceful parades or demonstrations in the unbridled discretion of the local officials. The pervasive restraint on freedom of discussion by the practice of the authorities under the statute is not any less effective than a statute expressly permitting such selective enforcement. A long line of cases in this Court makes it clear that a State or municipality cannot "require all who wish to disseminate ideas to present them first to police authorities for their consideration and approval, with a discretion in the police to say some ideas may, while others may not, be . . . disseminate[d] . . . ." *Schneider* v. *State, supra,* at 164. See *Lovell* v. *Griffin, supra; Hague* v. *CIO, supra; Largent* v. *Texas, supra; Saia* v. *New York, supra; Niemotko* v. *Maryland, supra; Kunz* v. *New York, supra.*

This Court has recognized that the lodging of such broad discretion in a public official allows him to determine which expressions of view will be permitted and which will not. This thus sanctions a device for the suppression of the communication of ideas and permits the official to act as a censor. See *Saia* v. *New York, supra,* at 562. Also inherent in such a system allowing parades or meetings only with the prior permission of an official is the obvious danger to the right of a person or group not to be denied equal protection of the laws. See *Niemotko* v. *Maryland, supra,* at 272, 284; cf. *Yick Wo* v. *Hopkins,* 118 U. S. 356. It is clearly unconstitutional to enable a public official to determine which expressions of view will be permitted and which will not or to engage in invidious discrimination among persons or groups either by use of a statute providing a system of broad discretionary licensing power or, as in this case, the

equivalent of such a system by selective enforcement of an extremely broad prohibitory statute.

It is, of course, undisputed that appropriate, limited discretion, under properly drawn statutes or ordinances, concerning the time, place, duration, or manner of use of the streets for public assemblies may be vested in administrative officials, provided that such limited discretion is "exercised with 'uniformity of method of treatment upon the facts of each application, free from improper or inappropriate considerations and from unfair discrimination' . . . [and with] a 'systematic, consistent and just order of treatment, with reference to the convenience of public use of the highways . . . .' " *Cox* v. *New Hampshire, supra,* at 576. See *Poulos* v. *New Hampshire, supra.*

But here it is clear that the practice in Baton Rouge allowing unfettered discretion in local officials in the regulation of the use of the streets for peaceful parades and meetings is an unwarranted abridgment of appellant's freedom of speech and assembly secured to him by the First Amendment, as applied to the States by the Fourteenth Amendment. It follows, therefore, that appellant's conviction for violating the statute as so applied and enforced must be reversed.

For the reasons discussed above the judgment of the Supreme Court of Louisiana is reversed.

*Reversed.*

[For concurring opinion of MR. JUSTICE BLACK, see *post,* p. 575.]

[For concurring opinion of MR. JUSTICE CLARK, see *post,* p. 585.]

[For opinion of MR. JUSTICE WHITE, concurring in part and dissenting in part, see *post,* p. 591.]