934 F.2d 318
Unpublished Disposition
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
CHRISTIAN KNIGHTS OF the KU KLUX KLAN INVISIBLE EMPIRE,
INC., Plaintiff-Appellant,
v.
Elsie Rast STUART, Mayor of The Town of Pelion, South
Carolina, the Town of Pelion, South Carolina,
Defendants-Appellees,
and
T. Travis Medlock, Attorney General of South Carolina, Defendants.
 No. 89-1585.
 United States Court of Appeals, Fourth Circuit.
 Argued Feb. 4, 1991.
Decided June 5, 1991.
As Amended June 21, 1991.
 
 Appeal from the United States District Court for the District of South Carolina, at Columbia. Henry Michael Herlong, Jr., Magistrate Judge. (CA-88-2883-3-15)
 Clarence Rauch Wise, Wise & Tunstall, Greenwood, S.C. (Argued), for appellant; George Daly, Charlotte, North Carolina, on brief.
 Marcus Angelo Manos, Nexsen, Pruet, Jacobs & Pollard, Columbia, S.C. (Argued), for appellees; Harold W. Jacobs, Nexsen, Pruet, Jacobs & Pollard, Columbia, S.C., on brief.
 D.S.C.
 AFFIRMED.
 Before K.K. HALL, Circuit Judge, BUTZNER, Senior Circuit Judge, and GRAHAM CALDER MULLEN, United States District Judge for the Western District of North Carolina, sitting by designation.
 PER CURIAM:
 
 
 1
 The Christian Knights of the Ku Klux Klan appeal a jury's verdict in favor of the Town of Pelion and its mayor in this civil rights action for damages. We affirm.
 
 I.
 
 2
 Every year since 1977, a Christmas parade had been organized for the town of Pelion by Ronnie Troutman, a private citizen who volunteered his time. In 1987, Troutman again organized a Christmas parade, to be held on December 19, 1987. Troutman secured permission from the town of Pelion to hold the parade and invited participation from groups whom he believed were suited to the theme of the Christmas season. About ten days before the parade, Horace King, the leader of the Ku Klux Klan in South Carolina, contacted Troutman and requested that the Klan be allowed to enter a float in the parade. He told Troutman that his organization would sue if it were not allowed to participate. Troutman called the Mayor to get permission for the Klan to be in the parade, and she told him that she did not believe it was appropriate. Troutman, under the impression that the Klan was legally entitled to participate, gave permission. Thereafter, Klan members began work on their float in reliance on Troutman's commitment.
 
 
 3
 Some of the groups that had previously accepted invitations withdrew, expressing concern for safety because of the Klan's participation. State Senator Joe Wilson of Lexington County contacted Travis Medlock, Attorney General of South Carolina, on December 18, 1987, and expressed his fear that violence would occur if the Klan participated in the Christmas parade. Medlock concluded that if the Klan's participation posed a threat to public safety or did not conform to the limited theme of the Christmas parade, Pelion could exclude the group.
 
 
 4
 Medlock contacted the Mayor of Pelion, the Lexington County Sheriff's Department, and Agent Bucky Harris of the State Law Enforcement Division.[1] Harris was aware of practices of the Klan which could easily produce violence at a parade, and he expressed his opinion to Medlock that there was an imminent threat to the public safety. Based on a consensus of opinions consistent with Harris' view, Medlock researched the law and issued an emergency opinion that the Town of Pelion could legally exclude the Klan from participating in the Christmas parade based on the town's right to protect its citizens from imminent danger. The next morning, the Pelion Town Council passed an ordinance prohibiting the Klan's participation. The Mayor, however, invited the Klan to parade at another time of its choosing. The Klan declined the invitation and instituted this action.
 
 
 5
 The Christian Knights sued the Town of Pelion, Mayor Stuart, in both her official capacity and as an individual, and the Attorney General, seeking damages, injunctive relief, and declaratory relief under 42 U.S.C. Sec. 1983.[2] Trial was by jury before a United States Magistrate. The jury returned a general verdict for the defendants, and this appeal followed.
 
 II.
 
 6
 Appellant argues on appeal that the magistrate court erred in instructing the jury that they should find for defendants if they would find that "a normal, ordinary, and prudent person in the same circumstances [as defendants] would have reasonably believed that the plaintiff's participation in the Christmas parade caused an imminent danger to public safety." Appellant argues that this instruction authorized a "heckler's veto" whereby third parties are allowed to suppress the First Amendment rights of another. The "heckler's veto" has been rejected by the Supreme Court of the United States as a legitimate basis for infringing upon First Amendment rights. Cox v. Louisiana, 379 U.S. 536 (1965).
 
 
 7
 A governmental entity may not permanently enjoin otherwise legal expression because of the threat of a hostile reaction from the public. Berger v. Battaglia, 779 F.2d 992 (4th Cir.1985), cert. denied, 476 U.S. 1159 (1986). Nevertheless, governmental entities retain the right to regulate the use of public streets to protect legitimate government interests in maintaining public order and avoiding violence. Cox, 379 U.S. at 554-56. The reasonableness or necessity of the governmental action must be judged on the basis of the interest being protected, and "[t]he Government generally has a freer hand in restricting expressive conduct than it has in restricting the written or spoken word." Texas v. Johnson, 491 U.S. 397, 406 (1989). Furthermore, the First Amendment does not forbid a state from preventing "imminent lawless action." Id. at 2542; Brandenburg v. Ohio, 395 U.S. 444, 447 (1969).
 
 
 8
 In this case, the court instructed the jury that if it found that the defendants reasonably believed that the appellant's participation in the Christmas parade would cause an imminent danger to public safety, it should decide for the defendants. Agent Harris testified that he discussed the situation with town officials at length and expressed his concern for public safety. He feared that, because of the magnitude of the parade and the mixture of the crowd,[3] authorities would not be able to protect the spectators if trouble developed. The primary concern was that Klan members would react violently to a minor display of hostility by spectators. His concern was based on his expert knowledge of the Klan and its past activities.[4] Under the facts presented in this case, a "heckler's veto" is not involved, because the real threat was believed to be presented by Klan members rather than by spectators.
 
 
 9
 The Town of Pelion and the Mayor did not permanently restrict the right of the Ku Klux Klan to rally or march because of the content of their speech. Instead, evidence showed that the Mayor invited King's organization to march at a later date when officials could better ensure the safety of all. On this occasion, the town's officials had reason to believe that violence was imminent, and as long as their belief was reasonable, their action was legal. The jury instruction was worded to ensure that the verdict was based on a finding that the officials reasonably believed that violence was imminent. Therefore, the instruction was proper.
 
 
 10
 AFFIRMED.
 
 
 
 [1]
 Agent Harris was an expert on the Klan organization in South Carolina, having been in charge of closely monitoring its activities since 1986. As part of his duties, he attended every Klan rally
 
 
 [2]
 The Klan later dismissed the Attorney General as a defendant and dropped its claims for injunctive and declaratory relief. The trial court granted summary judgment to the Mayor in her individual capacity, and the Klan does not appeal that order
 
 
 [3]
 The officials took into consideration that families with small children make up a large part of the crowd at a Christmas parade
 
 
 [4]
 For example, Harris testified that most Klan members carry weapons in their cars whenever they march or rally. There have been instances where, upon the slightest provocation, Klan members ran to their cars, returned with their weapons, and reacted violently to hostile spectators