63 F.3d 154
 Arthur JOHNSON, Plaintiff-Appellant,
v.
Captain Wayne BAX, New York Police Department; Lieutenant
Kiernan, NYPD; James DiMartino, Sergeant, NYPD; P/O
Horvath, NYPD; New York Police Department, and The City of
New York, Defendants-Appellees.
 No. 1758, Docket No. 94-7900.
 United States Court of Appeals,
Second Circuit.
 Argued June 19, 1995.
Decided Aug. 16, 1995.
 
 John J.P. Howley, Kaye, Scholer, Fierman, Hays & Handler, New York City, for plaintiff-appellant.
 Elizabeth I. Freedman, New York City (Paul A. Crotty, Corp. Counsel of the City of New York, Francis F. Caputo, New York City, on the brief), for defendants-appellees.
 Before: NEWMAN, Chief Judge, WALKER and CALABRESI, Circuit Judges.
 JON O. NEWMAN, Chief Judge:
 
 
 1
 The arrest of a citizen carrying a sign he wanted President Clinton to see during a 1993 visit to New York City has given rise to this appeal. The issue is whether a section 1983 complaint for false arrest and false imprisonment also presents an independent claim for violations of the First Amendment, and, if so, whether the First Amendment claim is barred by the plaintiff's acceptance of an "adjournment in contemplation of dismissal" ("ACD") that concluded the criminal case against the plaintiff. Plaintiff-appellant Arthur Johnson appeals from the July 26, 1994, judgment of the District Court for the Southern District of New York (John S. Martin, Jr., Judge) granting defendants-appellees, New York City police officers, the police department, and the City of New York, summary judgment and dismissing the complaint. The District Court construed Johnson's complaint as presenting claims only for false arrest and false imprisonment and ruled that acceptance of an ACD defeated those claims. Because we believe that appellant's complaint presents a claim for violations of the First Amendment that is not barred by his acceptance of an ACD, we reverse and remand.
 
 Background
 
 2
 On May 12, 1993, President Clinton came to Manhattan to give a speech at the Cooper Union for the Advancement of Science & Art ("Cooper Union"). The New York City Police Department, as is apparently its normal policy when dignitaries visit, established separate areas for "pro" and "anti" demonstrators in close proximity to the area of the visit. The main entrance to the Cooper Union is at Seventh Street and Fourth Avenue. The parties dispute the precise location of the "pro" demonstration area. According to the appellant, pro-Clinton demonstrators could stand "on the sidewalk on Fourth Avenue between 7th Street and Astor Place"; appellees, however, assert that the primary "pro" demonstration area was "in the roadway of Fourth Avenue, from Ninth Street heading south for 15 yards." The "anti" demonstration area appears to have been on "the east side of Third Avenue, from the southeast corner of Stuyvesant Place to the southeast corner of Ninth Street." The parties also dispute whether the "pro" and "anti" demonstration areas afforded equal access, in terms of sight and sound, to Cooper Union and the location where the President entered and exited the building.
 
 
 3
 On the day of the President's visit, appellant Johnson was displaying a sign at the northeast corner of Ninth Street and Fourth Avenue, two blocks from the main entrance of Cooper Union. The sign read "Mr. Clinton: STOP CAMPAIGNING AND LEAD !" Appellee police officers told Johnson that he could not display his sign at that location and asked him either to move to the anti-Clinton designated area or to put away the sign. Johnson refused to comply with either option. He argued that from the area designated for anti-Clinton demonstrators it would be impossible for the President either to see or to hear him.
 
 
 4
 Johnson also objected on two grounds to being sent to the "anti" demonstration area. First, he described his sign merely as offering constructive criticism or advice to the President, and not as displaying an anti-Clinton message. Second, he objected to being grouped with the only two demonstrators in the "anti" demonstration area, both of whom he described as "professional Marxists." When Johnson refused to move, the police confiscated his sign, but left him standing alone at Ninth Street and Fourth Avenue.
 
 
 5
 Johnson then made a second sign containing the same message as the first. The police returned and arrested him for obstruction of government administration and disorderly conduct. Johnson was arraigned on those charges, but subsequently released after accepting an ACD. That procedure permits a criminal case to be adjourned, with the State retaining the option to reinstate the case within six months; if the case is not reinstated, the charges are dismissed. See N.Y.Crim.Proc.Law Sec. 170.55 (McKinney 1993); Singleton v. City of New York, 632 F.2d 185 (2d Cir.1980), cert. denied, 450 U.S. 920, 101 S.Ct. 1368, 67 L.Ed.2d 347 (1981). Following Johnson's release, he filed the instant action, pro se, in the District Court.
 
 
 6
 Johnson's complaint with accompanying affirmation contained a description of the events of May 12, 1993, including the police officers' refusal to allow him to display his sign and their confiscation of the sign when he refused to move. The affirmation also stated that Johnson was arrested for drawing a second sign and was incarcerated for 41 hours. The complaint sought injunctive relief and damages for the officers' interference with his First Amendment rights. After Johnson's motion for a preliminary injunction was denied, both sides moved for summary judgment.
 
 
 7
 The District Court construed the complaint to allege only causes of action for false arrest and false imprisonment, omitting consideration of Johnson's claim that the violation of his First Amendment rights entitled him to relief. The Court then stated that the only fact material to the motion for summary judgment was whether Johnson had accepted an ACD, since, under Second Circuit precedents, a section 1983 action for false arrest or false imprisonment cannot be maintained after the acceptance of an ACD, which is not considered a termination "favorable to the defendant." See Singleton, 632 F.2d at 193; see also Roesch v. Otarola, 980 F.2d 850, 853-54 (2d Cir.1992) (involving similar Connecticut procedure). Since there was no triable issue as to the validity of Johnson's acceptance of the ACD, the District Court granted appellees' motion for summary judgment and dismissed the complaint.
 
 Discussion
 
 8
 On appeal, Johnson, now represented by counsel, argues that the District Court erred in granting summary judgment because it improperly characterized his pro se complaint as alleging claims only for false arrest and false imprisonment, when the complaint also stated a claim for violations of the First Amendment. Johnson also objects to appellees' assertion that Singleton and its progeny should be extended to bar a section 1983 claim based on violations of the First Amendment. Finally, appellant asserts that factual issues concerning his First Amendment claim preclude summary judgment.
 
 1. Characterization of the complaint
 
 9
 The District Court adjudicated only Johnson's claims for false arrest and false imprisonment and did not adjudicate his distinct claim for a violation of First Amendment rights. The limited scope of the Court's ruling is evident from its observation that disputed matters concerning such issues as the reasonableness of the location of the designated areas "while material to a constitutional analysis of the rule requiring protesters to stand in 'designated areas' are not material to the issue currently before the Court."
 
 
 10
 We agree with the appellant that the District Court erred in characterizing the complaint as presenting only claims for false arrest and false imprisonment.[1] Even though Johnson's effort to exercise his First Amendment rights led directly to his arrest and subsequent jailing, his complaint seeks relief for alleged First Amendment violations that do not depend upon the disposition of his claims for false arrest and false imprisonment. Johnson alleges impairment of First Amendment rights in numerous respects. He challenges the requirement that only those bearing signs are required to stand in designated areas. He also challenges the authority of the police to divide sign bearers into "pro" and "anti" groups, and the police determination that the message on his sign justified placing him in the "anti" demonstration area. He alleges that the police officers discriminated on the basis of viewpoint. He complains that the decision as to who must stand in which area was left to the individual police officer's discretion. Johnson further alleges that the designated areas were not equally close, and did not afford equal access, in terms of sight and sound, to Cooper Union. Based on these allegations, the complaint sought an injunction against the abridgement of First Amendment rights and damages for interference with such rights. Complaint, Relief Requested pp 1, 2. The damages sought for this cause of action, if ultimately awarded, would be independent of the damages unsuccessfully sought for the impairment of liberty resulting from the arrest and imprisonment. The First Amendment claim therefore requires assessment on its merits, irrespective of the dismissal of the claims for false arrest and false imprisonment.
 
 
 11
 Consideration of the First Amendment claim will pose substantial issues for the District Court. The basic principle pertinent to Johnson's claim is well settled. The government may regulate the use of streets for public assembly through "appropriate, limited discretion, under properly drawn statutes or ordinances, concerning the time, place, duration, or manner" of the use, Cox v. Louisiana, 379 U.S. 536, 558, 85 S.Ct. 453, 466, 13 L.Ed.2d 471 (1965), but the government's "limited discretion" must be exercised uniformly and systematically so as not to create any unfair discrimination. See id. (citing Cox v. New Hampshire, 312 U.S. 569, 576, 61 S.Ct. 762, 766, 85 L.Ed. 1049 (1941)).
 
 
 12
 However, this basic principle of permissible time, place, and manner regulation of public streets is not easily applied in the context of demonstrations at sensitive locations by those expressing opposing views. The difficulties are illustrated by the prior litigation in this Circuit over the demands of gay rights demonstrators and counter-demonstrators to express their views on the sidewalk in front of St. Patrick's Cathedral in Manhattan during the annual Gay Pride Parade. See Olivieri v. Ward, 801 F.2d 602 (2d Cir.1986), cert. denied, 480 U.S. 917, 107 S.Ct. 1371, 94 L.Ed.2d 687 (1987). In Olivieri, we adjusted the competing concerns for public safety and for expressions of opposing views by specifying that a limited number of those from each of the two contending groups could occupy barricaded areas on the sidewalk during separate, limited time periods. Id. at 604-05, 608.
 
 
 13
 The pending case poses issues more difficult than those presented in Olivieri. The public safety concerns are obviously weighty when police officers are given responsibilities for minimizing risks of danger to the President of the United States during a visit to a particular location. See White House Vigil for the ERA Committee v. Watt, 717 F.2d 568, 572 (D.C.Cir.1983). On the expression side of the balance, this case raises issues superficially similar to those in Olivieri as to the appropriateness of separating opposing demonstrators, yet the issues are more complex for several reasons.
 
 
 14
 First, the complaint in Olivieri challenged the decision of city officials to prevent any demonstrators from standing on the sidewalk in front of the Cathedral during the Gay Rights Parade, and the appeal raised both that issue and the further issue of whether, once demonstrators were allowed access to the sidewalk, equal access had to be allowed for the counterdemonstrators. See Olivieri, 801 F.2d at 606-08. In the pending case, Johnson challenges the police prohibition against his holding a sign at a distance of two blocks from the entrance to Cooper Union and the police requirement that sign-bearers within the vicinity stand in designated "pro" and "anti" areas.[2] Unlike Olivieri, the option of sequential placement of contending groups at the same location, available for a prolonged activity like a parade, is not applicable to a precise event like the President's entering and leaving a building.
 
 
 15
 Second, no demonstrator in Olivieri challenged placement within one or the other of the contending groups (divided by time), whereas Johnson asserts that his message did not warrant his inclusion in the area designated for anti-Clinton demonstrators. Even if those wishing to express views by displaying signs may lawfully be obliged to stand in areas designated for either "pro" or "anti" groups, Johnson raises the further issue of the extent to which police officers' categorization of any individual's message needs to be guided by properly promulgated standards for the exercise of discretion. Finally, to whatever extent designated areas may be required for simultaneous expressions of opposing views, issues of equal access to the intended recipient of the contending messages inevitably arise.
 
 
 16
 All of these issues must be resolved with an eye to avoiding the placement of "unfettered discretion in local officials in the regulation of the use of streets," Cox, 379 U.S. at 558, 85 S.Ct. at 466 (emphasis added), while allowing police officers some leeway to make appropriate on-the-spot judgments. We do not adjudicate any aspect of Johnson's First Amendment claim, but we conclude that it was sufficiently presented in the complaint to require consideration by the District Court.
 
 2. First Amendment claims after an ACD
 
 17
 Appellees further contend that, even if the complaint states a claim for a violation of the First Amendment, they were entitled to summary judgment because a First Amendment claim brought under 42 U.S.C. Sec. 1983 is barred by the acceptance of an ACD. Appellees urge us to extend our holdings in Singleton and Roesch to preclude section 1983 actions based on the First Amendment after the acceptance of an ACD. We believe that neither those holdings nor the policy considerations justifying them warrant such an extension.
 
 
 18
 In Singleton, we held that a defendant granted an ACD could not maintain a section 1983 action sounding in malicious prosecution. See Singleton, 632 F.2d at 193-94. We stated that an essential element of a section 1983 action for malicious prosecution was that the prosecution terminated in defendant's favor. Because we found that an ACD was not a favorable termination, we concluded that a plaintiff could not bring his federal claim. We reasoned that
 
 
 19
 [n]o purpose would be served in dismissing the criminal case if the issue of guilt or innocence were in any event to be litigated in a civil suit. The more prudent course, which would be less wasteful to the parties and the court, would be to bring the pending criminal case to trial.
 
 
 20
 Id. at 194. In Roesch, we extended the holding in Singleton to bar a section 1983 action sounding in false imprisonment. See Roesch, 980 F.2d at 853-54. We found the policy considerations that motivated the Court in Singleton to be equally appropriate in the context of a section 1983 claim for false imprisonment or false arrest.
 
 
 21
 Singleton and its progeny, however, have no application to a cause of action, such as Johnson's, alleging a violation of the First Amendment that happens to have occurred in the course of events that resulted in plaintiff's arrest and imprisonment. Unlike claims sounding in malicious prosecution, false arrest, or false imprisonment, the favorable termination of a criminal proceeding is not an essential element of an independent First Amendment claim. Moreover, though expressive activity protected by the First Amendment may not be punished as disorderly conduct or governmental obstruction, a person whose conduct renders him guilty of these offenses may nevertheless be entitled to protection with respect to some aspects of his expressive activity.
 
 
 22
 In this case, it is clear that Johnson has First Amendment claims independent of his claims for false arrest and false imprisonment. The First Amendment claims are not barred by his acceptance of an ACD with respect to the criminal charges that, absent the ACD, might have supported the false arrest or false imprisonment claims.
 
 3. Summary judgment
 
 23
 In remanding this case to the District Court, we note that there are genuine issues of material fact that preclude summary judgment on Johnson's First Amendment claim. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). One such issue involves whether appellees granted more favorable access to pro-Clinton demonstrators than they did to the anti-Clinton demonstrators, and the reasonableness of the general location of the "designated areas." The parties even dispute precisely where the "pro" demonstration area was located. Moreover, the parties dispute whether it was reasonable for the officers to cite safety concerns for the President as the basis for prohibiting Johnson to display his sign, while leaving Johnson unattended on Ninth Street and Fourth Avenue so long as he did not display his sign. Appellees argue that the policy of separating "pro" and "anti" demonstrators is a reasonable measure designed to ensure the safety of dignitaries visiting New York City, but Johnson contends that this is no more than a "pretext." Complaint p 3. In addition, there remains the issue advanced by Johnson that forcing him to display his sign, which he argues did not contain an anti-Clinton slogan, in an area designated for anti-Clinton protestors, effectively altered its message.
 
 Conclusion
 
 24
 For the foregoing reasons, the judgment of the District Court is vacated, and the case is remanded for further consideration of the appellant's First Amendment claim.
 
 
 
 [1]
 The District Court had previously made a preliminary assessment of Johnson's First Amendment claim in denying his motion for a preliminary injunction. In that ruling the Court said it was "highly improbable" that the policy of placing protestors in designated areas violated the First Amendment. The summary judgment ruling that dismissed the complaint gave no renewed consideration to the First Amendment claim
 
 
 [2]
 In Olivieri, we regarded the application of the time, place, and manner regulation to the two opposing groups to be "content-neutral since it is applicable to both groups." Olivieri, 801 F.2d at 607. The Supreme Court's decision in Boos v. Barry, 485 U.S. 312, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988), appears to have superseded Olivieri's test for determining whether a regulation is content-neutral. One opinion in Boos distinguished between primary effects of regulation--"the direct impact that speech has upon its listeners," id. at 321, 108 S.Ct. at 1164 (opinion of O'Connor, J. with whom Stevens and Scalia, JJ., join)--and secondary effects--"regulations that apply to a particular category of speech because the regulatory targets happen to be associated with that type of speech," id. at 320, 108 S.Ct. at 1163. Only regulations of speech "due to its potential primary impact," id. at 321, 108 S.Ct. at 1164, were deemed to be content-based. Boos offered as an example of a secondary effect the objective of protecting the security of embassies. Id
 In the pending case, the defendants contend that they are placing sign-bearers in designated "pro" and "anti" areas, not to shield the President or those nearby from their messages, but to avoid the dangers to the President and those nearby that might develop from escalating confrontations between members of opposing groups. Even if that is the intended purpose, an issue may well arise as to whether the grouping together of all those whose messages are in any sense "anti-Clinton" meets the secondary effects test of Boos. It is not hard to think of groups that might be opposed to a President, yet so hostile to each other that grouping them together will promote rather than avoid confrontations. And even if the fact of grouping "pro" and "anti" sign-bearers turns out, upon inquiry, to be a content-neutral regulation, an issue may arise as to whether the positioning of the two groups has afforded them equal opportunity to convey their messages.